1 F.3d 1371
 62 USLW 2075, Prod.Liab.Rep.(CCH)P 13,543
 William DUNN; Hess Oil Virgin Islands Corp.
v.
HOVIC; Amerada Hess Corp.; Keene Corporation
v.
The LITWIN CORPORATION; Litwin PanAmerican Corp.;
Borinquen Insulation Co.
Owens-Corning Fiberglas Corporation, Appellant.
 No. 91-3837.
 United States Court of Appeals,
Third Circuit.
 Argued April 22, 1992.
Decided July 27, 1993.
 
 Barry S. Simon (argued), Paul Mogin, Williams & Connolly, Washington, DC, for appellant.
 Joel H. Holt (argued), Christiansted, VI, Paul S. Minor, Minor & Guice, Biloxi, MS, for appellee.
 Before: SLOVITER, Chief Judge, MANSMANN and WEIS, Circuit Judges.
 Reargued In Banc February 2, 1993.
 Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS and WEIS, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 Preliminary Note
 
 1
 Before us is the appeal of Owens-Corning Fiberglas Corporation (OCF) from the judgment of the district court of the Virgin Islands awarding William Dunn $500,000 in compensatory damages and $2 million in punitive damages. A panel of this court heard argument on OCF's appeal on April 22, 1992 and issued an opinion affirming the compensatory damages award and remitting the punitive damages award to $1 million. Thereafter, the court granted OCF's petition for rehearing in banc, limited to the punitive damages issue. The panel's original opinion on the compensatory damages issue, modified in minor respects to reflect the recent procedural events, is refiled contemporaneously with this opinion.[1]
 
 
 2
 In its petition for rehearing and at oral argument before the in banc court, OCF directed its argument to its contention that multiple awards of punitive damages in asbestos-related injury cases should be prohibited as a matter of Virgin Islands law or federal due process. Accordingly, this opinion essentially restates the opinion of the panel on the issues of the sufficiency of the evidence, Dunn's closing argument, and the jury charge, but contains a more extended discussion of OCF's challenge to the excessiveness of punitive damage awards in asbestos cases.
 
 I.
 
 3
 SUFFICIENCY OF THE EVIDENCE FOR A PUNITIVE DAMAGES AWARD
 
 
 4
 The availability of punitive damages is ordinarily determined by the local law of the relevant jurisdiction, in some instances by statute and in other instances by legal principles developed by courts. Under the Virgin Islands Code:
 
 
 5
 The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the court of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.
 
 
 6
 V.I.Code Ann. tit. 1, Sec. 4 (1967). Thus we turn to the Restatement for the prevailing standard.
 
 
 7
 Section 908(2) of the Restatement (Second) of Torts provides that "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." In applying this section, we have previously stated that such conduct must be shown by clear and convincing evidence. Acosta v. Honda Motor Co., 717 F.2d 828, 839 (3d Cir.1983). OCF argues that the evidence was insufficient to support the award of punitive damages or, in the alternative, that the verdict went against the clear weight of the evidence, requiring a new trial on whether punitive damages are appropriate.
 
 
 8
 In support of its argument, OCF points to evidence tending to show that prior to its decision to place warning labels on Kaylo boxes, the prevailing industry belief was that asbestos insulation products were safe. See App. at 1522-24. OCF argues that its Kaylo product was considered an improvement over prior insulation products because it contained a lower percentage of asbestos. It points to an independent study conducted by Union Carbide between 1961 and 1963 which concluded that Kaylo, unlike Johns-Manville and Philip Carey products, could be safely used within the 5 million particles per cubic foot threshold limit value (TLV) established by the American Conference of Governmental Industrial Hygienists in 1946. See App. at 1355-72, 2287-97.
 
 
 9
 Nevertheless, we conclude that Dunn presented more than sufficient evidence from which a jury could conclude that OCF acted "with reckless indifference" in failing to place adequate warnings on its Kaylo product. Dunn's evidence revealed the following: In the early 1940s, insulation workers threatened to demand higher wages when using OCF's fiberglass material because of perceived health threats. See App. at 725-26. In response to this threat, Edward Ames, OCF's public relations officer and an assistant to its president, developed a plan to resolve this problem. As Ames explained, OCF had learned by this time that exposure to asbestos fibers could cause asbestosis. App. at 726.
 
 
 10
 In a memorandum to OCF's president and executive vice-president dated January 7, 1942, Ames made the following recommendation to inform workers of the extent of the hazard posed by asbestos-containing materials:
 
 
 11
 Gather as a weapon-in-reserve an impressive file of photostats of medical literature on asbestosis. Available are two bibliographies covering medical literature to 1938, citing references to scores of publications in which the lung and skin hazards of asbestos are discussed. This file would cover five or six hundred pages....
 
 
 12
 App. at 2151. This memorandum suggested that if OCF was unsuccessful in convincing union officials of the benefits of fiberglass as opposed to other asbestos-containing insulation products, then this "asbestosis weapon-in-reserve" would be sent to union workers to "let them stew." App. at 2152.
 
 
 13
 When asked if OCF's then-president, Harold Boeschenstein, knew that asbestos products might pose a hazard to the lungs, Ames answered, "Mr. Boeschenstein knew everything." App. at 727. In addition, OCF's attorney thought that Ames's plan was "a germ of a major strategy" and approved compiling an asbestosis file. App. at 729.
 
 
 14
 In 1943 Ames wrote another memorandum in which he criticized a proposal for adding asbestos to fiberglass, see App. at 732-33, writing:
 
 
 15
 In formulating our policy on admixtures with asbestos, we should keep on the alert because otherwise we will run the risk of smearing fiberglas [sic] with the hazards of exposure to asbestos.
 
 
 16
 Fabrication of asbestos (in both textile and pre-textile form) is a dusty process, and exposure to asbestos fly involves the danger of asbestosis, a pathological lung condition ... minimized by the use of hoods and ... respirators.
 
 
 17
 App. at 2154.
 
 
 18
 In 1944 Ames received a letter from a physician informing OCF that a patient of his, who had worked as an insulator, had developed asbestosis from exposure to insulation products. The letter stated in pertinent part:
 
 
 19
 pipe coverer handling ... asbestos ... products on industrial insulation jobs [was] suffering from asbestosis, a condition that results from exposure to asbestos dust. The disease is a well recognized form of lung pathology that manifests itself in a diminution of lung capacity resulting in dyspnea or shortness of breath.
 
 
 20
 App. at 2155.
 
 
 21
 OCF began distributing Kaylo products in 1953, and from 1958 until 1972 manufactured Kaylo insulation. App. at 1068. In the 1950s, Dr. Garret Schepers, head of the Saranac Laboratory in New York, warned OCF that Kaylo contained material that would be hazardous to human beings. App. at 1018. Dr. Schepers also wrote two letters to Dr. M.D. Burch, director of personnel and industrial relations at OCF at the time, advising him that "asbestos is fairly well incriminated as a carcinogen," App. at 2198, and that asbestos dust caused fibrosis. App. at 2207. Despite these warnings, OCF published brochures which repeatedly represented Kaylo as "non-toxic." App. at 2209, 2210, 2211, 2212, 2215. In addition, OCF touted Kaylo's "ease of application," see App. at 2211, and its "pleasant handling characteristics." App. at 2212. These brochures contained no warning of potential hazards.
 
 
 22
 A 1960 study of one of OCF's Kaylo manufacturing plants revealed that excessive asbestos dust exposure resulted from simply packing Kaylo into boxes. App. at 220-22. In 1963 the head of OCF's product development laboratory informed various corporate officers around the country that "[a]sbestos (as found in Kaylo) when breathed into the lungs causes asbestosis which often leads to lung cancer." App. at 2221. In 1964 the National Insulation Manufacturers Association, of which OCF's representative was a director, noted that Johns Manville had decided to place warnings on its asbestos products. App. at 2225. OCF, however, declined to do so, see App. at 2229, even though it knew that insulators had a six to seven times greater incidence of lung cancer than the general male population. App. at 2226.
 
 
 23
 In early 1965, Dr. F.H. Edwards of OCF wrote to OCF's medical director as well as other corporate officials urging that serious consideration be given to labelling Kaylo products since "the amounts requested [by claimants] are usually sizeable." App. at 2229. Dr. Edwards reiterated this suggestion in a memorandum dated August 6, 1966 in which he also acknowledged that "[i]t is impossible to guess the amount of dust created by the cutting, sawing, etc. of Kaylo. There are too many local factors involved." App. at 2230-31. Although OCF claimed that by December 1966 it had placed warning labels on its products,[2] see App. at 1230, Dunn testified that he did not see warning labels on any of the cartons holding Kaylo that he observed in the Virgin Islands. App. at 870, 873. This testimony was echoed by McComely Bully, one of Dunn's co-workers at HOVIC. See App. at 623-34, 645. OCF did not offer the testimony of any HOVIC worker to the contrary.
 
 
 24
 Dr. Egilman testified about the medical literature available at the time concerning the potential harm of exposure to asbestos dust. He noted that in the 1930s medical literature questioned the health effects of exposure to asbestos by insulators, particularly if the dust could be seen. App. at 167-71. In 1947 the confidential Hemeon Report was issued to the Asbestos Textile Institute, of which OCF has never been a member. This report questioned whether the then-generally acknowledged TLV for levels of exposure to asbestos provided "complete assurance[s]" of "thorough[ ] safe[ty]." App. at 2181. Finally, Dr. Egilman testified about a 1949 article in the Journal of the American Medical Association which recognized that asbestos workers were at risk of developing cancer. App. at 233. In his opinion, that article "establishe[d] that the general medical community was aware of the fact that asbestos caused cancer." App. at 233.
 
 
 25
 In light of this evidence, we agree with the recent conclusion of the Virginia Supreme Court that
 
 
 26
 [t]he jury may have concluded ... that Owens-Corning knew that inhalation of dust from its Kaylo product could cause lung disease in humans, that it actively concealed this danger, and it did not warn insulators of this hazard....
 
 
 27
 Owens-Corning Fiberglas Corp. v. Watson, 243 Va. 128, 413 S.E.2d 630, 642 (1992). The jury could reasonably have found that OCF acted with "reckless indifference to the rights of others" in this case, Restatement (Second) of Torts Sec. 908(2) (1977), and thus, the district court appropriately denied OCF's motion for JNOV and did not abuse its discretion in refusing to grant unconditionally the motion for a new trial.
 
 II.
 DUNN'S CLOSING ARGUMENT
 
 28
 OCF claims that it was denied a fair trial on the issue of punitive damages because of several remarks made by Dunn's counsel during closing arguments to the jury. Specifically, OCF argues that the following remarks or actions were improper: (1) the argument that the jury should return a large punitive award to force OCF to stop defending asbestos cases, see App. at 1761; (2) the suggestion by Dunn's counsel that counsel for OCF lied to the jury,[3] see App. at 1755; (3) the argument that the jury should award punitive damages as a reward to Dunn for bringing this lawsuit, see App. at 1756; (4) the request that the jury draw an analogy to the criminal fine imposed on Michael Milken earlier that week, see App. at 1758-59; and (5) the appeal to the jury's local prejudice against "this big multi-national company."[4] See App. at 1762.
 
 
 29
 At the outset, we note that there are aspects of the plaintiff's closing argument that we believe crossed the line between acceptable advocacy and imprudent zeal. However, our disapproval of portions of the closing is not enough to warrant reversal on that ground. We note that OCF failed to make a timely objection with respect to the statements referred to in (1), (3)[5] and (5)[6] above, and thus has waived its challenge to these statements on appeal. See Woods v. Burlington N.R.R., 768 F.2d 1287, 1292 (11th Cir.1985) (per curiam) (when party fails to object to improper closing argument, court of appeals only "retain[s] the authority to review for plain error[, the exercise of which] is seldom justified in reviewing argument of counsel in a civil case"), rev'd on other grounds, 480 U.S. 1, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987); Hyman v. Life Ins. Co., 481 F.2d 441, 444 (5th Cir.1973) (same); see also DeRance, Inc. v. PaineWebber, Inc., 872 F.2d 1312, 1326 (7th Cir.1989) (motion for mistrial on grounds of improper closing argument did not preserve issue for appeal when motion lacked requisite specificity).
 
 
 30
 Although OCF did preserve its claims with respect to points (2) and (4),[7] in general "the trial judge is in a better position than an appellate court to determine whether remarks of counsel are prejudicial," Herman v. Hess Oil Virgin Islands Corp., 524 F.2d 767, 772 (3d Cir.1975), and "at least for civil trials, ... improper comments during closing arguments rarely rise to the level of reversible error." Littlefield v. McGuffey, 954 F.2d 1337, 1346 (7th Cir.1992) (internal quotation omitted); see Lewis v. Penn Cent. Co., 459 F.2d 468, 470 (3d Cir.1972), (trial judge has broad discretion in determining whether counsel's closing remarks were proper).
 
 
 31
 Here, the district court concluded that the remarks about corporate lies "are not improper in a summation regarding punitive damages," Dunn v. Owens-Corning Fiberglass, 774 F.Supp. 929, 949, relying on the trial court's statement in Herman that "[i]n attempting to convince a jury that a defendant's conduct was outrageous and should be punished, an advocate must go beyond the kind of argument necessary to establish ordinary negligence." 379 F.Supp. 1268, 1276 (D.V.I.1974) (footnote omitted), aff'd, 524 F.2d 767 (3d Cir.1975); see also Arnold v. Eastern Air Lines, Inc., 681 F.2d 186, 197-98 (4th Cir.1982) (permissible range in punitive damage arguments is wide and inescapably volatile), cert. denied, 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983), rev'd in part on other grounds, 712 F.2d 899 (4th Cir.1983) (in banc), cert. denied, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).
 
 
 32
 OCF relies on Draper v. Airco, Inc., 580 F.2d 91 (3d Cir.1978), to support its claim that Dunn's reference to "corporate lies" constituted reversible error. However, that case is distinguishable. In Draper,
 
 
 33
 [c]ounsel for the plaintiff ... committed the following improprieties: (1) he attempted to prejudice the jurors through repeated inappropriate references to the defendants' wealth; (2) he asserted his personal opinion of the justness of his client's cause; (3) he prejudicially referred to facts not in evidence; and (4) without provocation or basis in fact, he made several prejudicial, vituperative and insulting references to opposing counsel.
 
 
 34
 Id. at 95.[8] The remarks of Dunn's counsel, while arguably intemperate, did not approach the unprofessional and prejudicial conduct of the attorney in Draper; the reference to lies told in the courtroom hardly qualifies as a "vituperative and insulting" reference to counsel for OCF. When read in context, Dunn's counsel's argument regarding "corporate lies" referred to statements made by OCF and its witnesses, not its attorneys.
 
 
 35
 Our review of Dunn's closing argument reveals that his counsel referred to Milken to stress the point that OCF as a wrongdoer should be punished. Punishment is one of the goals of punitive damages. See Restatement (Second) of Torts Sec. 908 cmt. a (1977). The district court was in the best position to assess any potential prejudicial impact of this reference. In light of the evidence presented as to OCF's conduct and the closing argument as a whole, we cannot conclude that the district court abused its discretion in not providing a curative instruction or in declining to order a mistrial.
 
 III.
 JURY CHARGE
 
 36
 OCF claims that the jury charge was defective both under Virgin Islands law and the federal constitution for failing adequately to explain how to determine the amount of the punitive damages.
 
 A. Virgin Islands Law
 
 37
 OCF argues that the court's instruction was inadequate under Virgin Islands law because it did not inform the jury of the relevance of plaintiff's actual injuries in calculating punitive damages. We need not decide whether Virgin Islands law requires such an instruction,[9] because OCF failed to make a timely and specific objection challenging the charge as erroneous under Virgin Islands law. Thus, this issue was not properly preserved for appeal under Federal Rule of Civil Procedure 51.[10] See Don Kemper Co. v. Beneficial Standard Life Ins. Co., 425 F.2d 221, 222 & n. 4 (3d Cir.1970); Bogacki v. American Mach. & Foundry Co., 417 F.2d 400, 407 (3d Cir.1969).
 
 
 38
 OCF's only suggestion that "[t]he amount of punitive damages must bear a reasonable relationship to the actual damages suffered by the plaintiff" appeared in a proffered supplemental jury instruction, App. at 1497, which the district court did not consider because it was tendered after the cut-off for submitting instructions. See App. at 1592-94, 1605. In addition, despite being specifically informed by the district court at the time it proffered the supplemental instruction that "[a]fter [the] charge [to] the jury, you'll have a chance to make any exceptions you want to the charge," App. at 1594, OCF nevertheless failed to challenge the charge as deficient under Virgin Islands law after the charge was given. OCF's post-charge objections were limited to constitutional grounds, see App. at 1778, 1779, 1783, and the district court responded to OCF's objection on those grounds only. See App. at 1781, 1783; see also Hoffman v. Sterling Drug, Inc., 485 F.2d 132, 139 n. 22 (3d Cir.1973) (rejecting under Rule 51 appeal where defendant objected to charge on one ground but sought to appeal on another).
 
 
 39
 As we have noted in the past, the purpose of Rule 51 is to " 'afford the trial judge an opportunity to correct the error in h[er] charge before the jury retires to consider its verdict' and to lessen the burden on appellate courts by diminishing the number of rulings at the trial which they may be called on to review." McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 769 n. 29 (3d Cir.1990) (quoting Porter v. American Export Lines, Inc., 387 F.2d 409, 412 (3d Cir.1968)). In this case, a curative instruction could have remedied any infirmity in the charge. OCF's failure to make a specific objection to the court's instruction under Virgin Islands law subverted the purpose of Rule 51,[11] and we thus decline to review OCF's objections to the charge on that ground. See United States v. Logan, 717 F.2d 84, 91 (3d Cir.1983) (absent objection, charge reviewed for plain error only); Trent v. Atlantic City Elec. Co., 334 F.2d 847, 859 (3d Cir.1964) (same).
 
 B. Constitutional Law
 
 40
 OCF also argues that the charge was constitutionally infirm. It complains of the trial court's alleged (1) inadequate instruction on the dual goals of punitive damages; (2) failure to instruct the jury that it must take into consideration the character and degree of the wrong as shown by the evidence; and (3) inadequate post-trial review.
 
 
 41
 Before turning to the merits of OCF's constitutional challenge, we conclude that OCF failed to preserve the objection in (2) above under Rule 51. Following the jury charge, OCF objected that it was "unconstitutionally uninformed" because "it does not provide standards for the jury upon which to base an award of punitive damages." App. at 1778. This general objection alone was not specific enough to inform the court how to provide clearer standards.
 
 
 42
 OCF's proposed jury instruction did not contain language requiring the jury to consider the character and degree of the wrong to the plaintiff, see App. at 1636-38, and it never objected on that ground. The only objection we can find that remotely resembles the point now urged on appeal stems from OCF's suggestion that the amount of punitive damages must bear a reasonable relationship to the amount of compensatory damages. See App. at 1783. This objection did not adequately put the court on notice of the issue OCF now raises.
 
 
 43
 As the Court of Appeals for the Eighth Circuit recently stated in a similar case:
 
 
 44
 Although [defendant] made a general objection that the court's instructions on punitive damages violated the fourteenth amendment, [its] requested instruction did not elaborate any further on the standard for setting the amount of punitive damages. While we recognize that a party need not tender specific language if it has otherwise objected to an inadequacy in an instruction, we believe the overall record here shows that [defendant] did not comply with Fed.R.Civ.P. 51 by bringing to the court's attention the need for the jury to consider the nature and degree of the wrong.
 
 
 45
 Robertson Oil Co. v. Phillips Petroleum Co., 930 F.2d 1342, 1347 (8th Cir.1991) (footnote and citation omitted); see also McCleary v. Armstrong World Indus., Inc., 913 F.2d 257, 260 (5th Cir.1990). These words apply with equal force in this case, and thus we decline to review this point on appeal.
 
 
 46
 Turning to the remainder of OCF's constitutional objections to the charge, we look first to Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), where the Supreme Court held that the common-law method for assessing punitive damages is not so inherently unfair as to deny due process and be per se unconstitutional. Id. at 15, 111 S.Ct. at 1043. The Court described the three-tier commonlaw method for assessing punitive damages as follows:
 
 
 47
 Under the traditional common-law approach, the amount of the punitive damage award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable.
 
 
 48
 Id. at 15, 111 S.Ct. at 1042.
 
 
 49
 In its most recent pronouncement on punitive damages, TXO Production Corp. v. Alliance Resources Corp., --- U.S. ----, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), the Court rejected the claim that "a $10 million punitive damages award--an award 526 times greater than the actual damages awarded by the jury--is so excessive that it must be deemed an arbitrary deprivation of property without due process of law." Id. at ----, 113 S.Ct. at 2718 (plurality opinion). As we interpret TXO, a plurality of the Court substantially adhered to the due process formulation first articulated in Haslip. Justices Scalia and Thomas, who concurred in the judgment, rejected the plurality's position that there exists "a substantive due process right that punitive damages be reasonable," --- U.S. at ----, 113 S.Ct. at 2726, and Justice Kennedy stated that the Constitution "does not concern itself with dollar amounts, ratios, or the quirks of juries in specific jurisdictions." Id. at ----, 113 S.Ct. at 2724 (Kennedy, J., concurring in part and concurring in the judgment). Absent further guidance from the Court, we will rely on Haslip's majority opinion in assessing OCF's due process challenge in this case. We note, however, that two of the concurring Justices characterized the procedures approved in TXO as "far less detailed and restrictive than those upheld in Haslip." Id. --- U.S. at ----, 113 S.Ct. at 2727 (Scalia, J., with Thomas, J., concurring in the judgment).
 
 
 50
 In its analysis of the constitutionality of the punitive damages award in Haslip of more than $800,000, the Court eschewed drawing "a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." Id. at 15, 111 S.Ct. at 1043. The Court noted, however, that "general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus." Id.
 
 
 51
 The Court looked first to the jury instruction and concluded that although it gave the jury "significant discretion," the instruction nonetheless "enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory." Id. at 16, 111 S.Ct. at 1044. Although the district court's jury instruction in this case was not a word-for-word duplication of the charge in Haslip, it contained all of the elements identified by the Court in Haslip. The instruction adequately conveyed that punitive damages are to punish the defendant and deter it and others from similar conduct in the future. See App. at 1777-78 ("it should be an award which stings [i.e., punishes] the defendant and will act as a deterrent to such conduct by the defendant in the future and a warning to others"). The district court also told the jury that it was not required to award punitive damages, and that such damages are "allowed only for wanton and reckless behavior ... [where] defendant's conduct was outrageous because done with an evil motive or done with reckless indifference to the rights of others." App. at 1776.
 
 
 52
 Other courts of appeals have approved similar jury charges as providing due process under Haslip. See Glasscock v. Armstrong Cork Co., 946 F.2d 1085, 1097 (5th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992); American Employers Ins. v. Southern Seeding Servs., Inc., 931 F.2d 1453, 1457-58 (11th Cir.1991). But see Mattison v. Dallas Carrier Corp., 947 F.2d 95, 105-06 (4th Cir.1991). While we acknowledge that the district court could have given the jury more guidance on the issue of punitive damages,[12] we cannot conclude that the charge was constitutionally defective.
 
 
 53
 The second inquiry made by the Court in Haslip was whether the post-trial procedures ensure "meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages." 499 U.S. at 16, 111 S.Ct. at 1044. Of course, if a charge is fatally defective, it will not be cured by post-trial review. We have found no fatal defect. Nonetheless, the scope of both trial court and appellate review were significant features in the Court's approval of the Haslip jury's punitive damage award, and thus we consider those applicable here.
 
 
 54
 In Haslip, the Court noted that under the applicable Alabama precedent, the factors a trial court considers in scrutinizing a jury verdict for excessiveness of the damages are "the 'culpability of the defendant's conduct,' the 'desirability of discouraging others from similar conduct,' the 'impact upon the parties,' and 'other factors, such as the impact on innocent third parties.' " 499 U.S. at 16, 111 S.Ct. at 1044 (quoting Hammond v. City of Gadsden, 493 So.2d 1374, 1379 (Ala.1986)).
 
 
 55
 Under federal law as well, a district court reviews damages awards for excessiveness. See Kazan v. Wolinski, 721 F.2d 911, 914 (3d Cir.1983) (remittitur available only when "so large as to shock the conscience of the court"). The district court in this case appropriately applied this standard, see Dunn, 774 F.Supp. at 950, and indeed ordered a remittitur and provided reasons for that decision. OCF complains that the trial court did not review the jury award de novo, but only gave it substantial deference. The court stated that it would " 'remit the portion of the verdict in excess of the maximum amount supportable by the evidence.' " Id. (quoting Kazan, 721 F.2d at 914). Nothing in Haslip requires more.
 
 
 56
 The Court's decision in TXO provides further support for our conclusion that the district court's review of the jury verdict in this case satisfied due process. In that case, the Court rejected a due process challenge based on the alleged inadequacy of the trial judge's review of the punitive damages award, even though the trial court failed to provide reasons for its denial of the petitioner's JNOV and remittitur motions. See --- U.S. at ----, 113 S.Ct. at 2724.[13]
 
 
 57
 We recognize that in Mattison v. Dallas Carrier Corp., 947 F.2d 95 (4th Cir.1991), the court held that the procedure applied under South Carolina law to punitive damages awards did not provide due process, and that Virgin Islands procedure is similar in that neither jurisdiction mandates a set of criteria a jury must consider when calculating punitive damages. We are unpersuaded by Mattison. Instead, we agree with the holding in Glasscock, 946 F.2d at 1098-99, a diversity case involving Texas law, that federal post-trial review under Rules 50 and 59 and federal appellate review of a jury award provide sufficient constraint on a jury's discretion to satisfy the requirements of due process. See also Eichenseer v. Reserve Life Ins. Co., 934 F.2d 1377, 1380-86 (5th Cir.1991) (same, in diversity case applying Missouri law).
 
 
 58
 Although the court in Mattison concluded that the standards for calculating punitive damages awards were unconstitutionally vague, relying on Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966), see Mattison, 947 F.2d at 102-03, this precise argument was rejected by the Court in Haslip, which distinguished Giaccio on the ground that it concerned the imposition of liability rather than the jury's discretion in fixing the amount of damages or costs. 499 U.S. at 16 n. 12, 111 S.Ct. at 1046 n. 12. Furthermore, we deem it significant that under Virgin Islands law (as under South Carolina law) a plaintiff must establish liability for punitive damages by clear and convincing evidence, a higher burden than under the Alabama scheme upheld in Haslip, which only required proof by a preponderance of the evidence. See id. at 19 n. 11, 111 S.Ct. at 1046 n. 11 (specifically declining to hold that due process required a greater standard of proof).
 
 
 59
 Finally, we underscore the "fact intensive nature of the due process analysis articulated in Haslip." Eichenseer, 934 F.2d at 1386; see also TXO, --- U.S. at ----, 113 S.Ct. at 2720 ("[Punitive damages] awards are the product of numerous, and sometimes intangible, factors; a jury imposing a punitive damages award must make a qualitative assessment based on a host of facts and circumstances unique to the particular case before it.") (plurality opinion).
 
 
 60
 In this case, after the district court reviewed the record and determined that the evidence supported a finding of willfulness and wantonness on OCF's part, see Dunn, 774 F.Supp. at 948-49, it considered OCF's net worth, the relationship between the size of the compensatory award and its remitted punitive damages award,[14] and the size of such awards in other cases in determining that remittitur was appropriate. See id. at 951. This independent review led the court to conclude that a $2 million dollar award would both act as an adequate punishment and deterrent.[15] These factors considered in post-trial review were approvingly referred to in Haslip, and serve as an effective counterpoint to the wide discretion given the jury.[16]
 
 
 61
 The third check referred to by the Haslip Court on the jury's or trial court's discretion was the Alabama Supreme Court's review of punitive awards. We will perform an analogous function in the next section. The Constitution requires no more.
 
 IV.
 EXCESSIVENESS OF THE PUNITIVE DAMAGES AWARDED
 
 62
 OCF's remaining contentions are directed to the allegedly excessive amount of punitive damages awarded. OCF first argues that the jury award was the result of passion, prejudice, or bias, and that the district court should have ordered a new trial unconditionally rather than conditioning the grant of a new trial on Dunn's acceptance of a remitted damages award. Of course, if OCF had shown that the jury verdict resulted from passion or prejudice, a new trial, rather than a remittitur, would have been the proper remedy. See Mason v. Texaco, Inc., 948 F.2d 1546, 1561 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992); Westbrook v. General Tire & Rubber Co., 754 F.2d 1233, 1241 (5th Cir.1985); Brown v. McBro Planning & Dev. Co., 660 F.Supp. 1333, 1337 (D.V.I.1987); Schreffler v. Board of Educ., 506 F.Supp. 1300, 1308 (D.Del.1981); see also 6A James Wm. Moore et al., Moore's Federal Practice p 59.08, at 197-98 (2d ed. 1992).
 
 
 63
 However, we do not accept OCF's argument that in this case the size of the award alone was enough to prove prejudice and passion. Even if there were some level of award that would in itself evidence prejudice and passion, see Wells v. Dallas Indep. Sch. Dist., 793 F.2d 679, 684 (5th Cir.1986), we cannot hold that the $25 million award here, albeit large, necessarily indicates a verdict tainted by prejudice and passion in light of the evidence before the jury concerning OCF's knowledge of the health hazards associated with asbestos, OCF's net after-tax earnings for the three years prior to trial which averaged almost $200 million, and OCF's net worth of approximately $2.2 billion. App. at 1743.
 
 
 64
 In Cash v. Beltmann North American Co., 900 F.2d 109, 111 n. 3 (7th Cir.1990), the court, after reviewing several punitive damage awards cases, concluded that "a typical ratio for a punitive damages award to a defendant's net worth may be around one percent." In this case, the jury's $25 million award (approximately 1% of OCF's $2.2 billion net worth) certainly fell within this range. See also Gregg v. U.S. Indus., Inc., 887 F.2d 1462, 1477 (11th Cir.1989) (approving $2 million punitive damages award which represented ".4% of [defendant's] net worth of $520 million"); Burke v. Deere & Co., 780 F.Supp. 1225, 1238 (S.D.Iowa 1991) (remitting $50 million punitive damages award to $28 million, approximately 1% of defendant's $2.8 billion net worth).
 
 
 65
 A multi-million dollar punitive damages award is not unique in products liability cases. See, e.g., Glasscock v. Armstrong Cork Co., 946 F.2d 1085 (5th Cir.1991) ($6.1 million in asbestos case); O'Gilvie v. International Playtex, Inc., 821 F.2d 1438 (10th Cir.1987) ($10 million in toxic shock syndrome case), cert. denied, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988); Cathey v. Johns-Manville Sales Corp., 776 F.2d 1565 (6th Cir.1985) ($1.5 million in asbestos case), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986); Kociemba v. G.D. Searle & Co., 707 F.Supp. 1517 (D.Minn.1989) ($7 million in I.U.D. case); Palmer v. A.H. Robins Co., 684 P.2d 187 (Colo.1984) ($6.2 million in Dalkon Shield case).
 
 
 66
 If an excessive jury determination were per se proof of passion, prejudice, or bias, there would have been no reason for the Supreme Court to have said in Haslip that "[t]he Alabama Supreme Court's post-verdict review ensures that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages." 499 U.S. at 16, 111 S.Ct. at 1045. We have held that "where no clear judicial error or 'pernicious influence' can be identified but where the verdict is so large as to shock the conscience of the court," the appropriate action for the court is to "order[ ] plaintiff to remit the portion of the verdict in excess of the maximum amount supportable by the evidence or, if the remittitur [is] refused, to submit to a new trial." Kazan v. Wolinski, 721 F.2d 911, 914 (3d Cir.1983).
 
 
 67
 Many courts have sustained or ordered remittiturs involving reductions to jury punitive damage awards comparable to that ordered here, thereby implicitly rejecting the argument that an excessive jury award in itself is a basis for a new trial. See, e.g., Grimshaw v. Ford Motor Co., 119 Cal.App.3d 757, 818-19, 174 Cal.Rptr. 348 (1981) ($125 million to $3.5 million; more than 30 to 1 ratio); State Farm Mut. Auto. Ins. Co. v. Zubiate, 808 S.W.2d 590, 605-06 (Tex.Ct.App.1991) ($15 million to $660,000; more than 20 to 1); West v. Johnson & Johnson Prods., Inc., 174 Cal.App.3d 831, 871-72, 220 Cal.Rptr. 437 (1985) ($10 million to $1 million; 10 to 1), cert. denied, 479 U.S. 824, 107 S.Ct. 96, 93 L.Ed.2d 47 (1986); Gregg v. U.S. Indus., Inc., 887 F.2d 1462, 1477 (11th Cir.1989) ($18.5 to $2 million; more than 9 to 1); Republic Ins. Co. v. Hires, 107 Nev. 317, 810 P.2d 790, 792-93 (1991) ($22.5 million to $5 million; more than 4 to 1); Hodder v. Goodyear Tire & Rubber Co., 426 N.W.2d 826, 836-37 (Minn.1988) ($12.5 million to $4 million; more than 3 to 1), cert. denied, 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989); Mason, 948 F.2d at 1561 ($25 million to $12.5 million; 2 to 1).
 
 
 68
 In Acosta v. Honda Motor Co., in considering the issue of punitive damages awards against a manufacturer of a harmful product, we noted that "a jury might decide that a defendant's financial position, as a result of other awards of punitive damages for the same conduct, is so precarious that a sizeable award of punitive damages would be inappropriate." 717 F.2d 828, 839 n. 17 (3d Cir.1983). In this case, OCF made the strategic decision not to introduce into evidence before the jury information concerning other punitive damages awards assessed against it. Had it done so, the jury might have made a smaller award. We thus conclude that OCF has failed to prove that the jury's verdict, admittedly quite large, reflected such passion and prejudice as to mandate a new trial.
 
 
 69
 OCF contends that when the trial court calculated its remitted punitive damages award, it refused to consider OCF's submission regarding other awards against it because the court believed that evidence should have been presented to the jury. There is nothing in the district court's opinion that supports OCF's contention.
 
 
 70
 Nor does OCF point to anything in the record to support its contention that the trial court set the remitted damages figure by taking into account OCF's conduct toward persons other than Dunn. Recently, several courts have rejected due process challenges by asbestos manufacturers, concluding in each case that "the evidence demonstrated that the punitive damage awards were only for the harm inflicted upon the specific plaintiffs...." in each case. Owens-Illinois v. Armstrong, 87 Md.App. 699, 591 A.2d 544, 557 (1991), aff'd in part & rev'd in part, 326 Md. 107, 604 A.2d 47 cert. denied, --- U.S. ----, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992); see also King v. Armstrong World Indus., Inc., 906 F.2d 1022, 1030 (5th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2236, 114 L.Ed.2d 478 (1991); Simpson v. Pittsburgh Corning Corp., 901 F.2d 277, 281 (2d Cir.), cert. dismissed, 497 U.S. 1057, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990); Man v. Raymark Indus., 728 F.Supp. 1461, 1466 (D.Haw.1989); Eagle-Picher Indus., Inc. v. Balbos, 326 Md. 179, 604 A.2d 445, 472 (1992). In fact, in this case the district court explicitly referred to the amount of the compensatory damages awarded to Dunn when it calculated the amount of the remitted punitive damages award, thus demonstrating that the punitive damages award was intended to represent punishment for OCF's conduct with respect to Dunn. The district court's charge that the jury only award punitive damages if "plaintiff has clearly and convincingly established that the action of defendant which caused injury to the plaintiff was wanton and reckless," App. at 1776 (emphasis added), further reveals the court's awareness that punitive damages were to be assessed only with respect to the harm OCF caused Dunn.
 
 
 71
 OCF argues that its "negative net worth" militates against a large punitive damages award. The ability to pay, as will be developed below, is a relevant factor in assessing punitive damages awards, but OCF is not well-situated to raise this issue. As Dunn's expert witness testified, OCF's large indebtedness was incurred to ward off a take-over attempt in 1986, App. at 1740-41, and it thus obscures the company's true value. The expert estimated OCF's value at the time of trial to be around $2.2 billion, App. at 1743, basing this figure on OCF's annual average after-tax earnings of approximately $200 million for each of the three years prior to trial. Thus, the $2 million award fixed by the trial court was well within OCF's ability to pay, and in itself would not require the further remittitur sought by OCF.
 
 
 72
 We turn next to our role in the assessment of punitive damages. We cannot leave the amount of punitive damages solely to the trial court because it is evident to us that the Supreme Court in Haslip approved review by an appellate court to "determin[e] whether a particular award is greater than reasonably necessary to punish and deter." 499 U.S. at 19, 111 S.Ct. at 1046. The principal issue impelling us to take this otherwise routine product liability case in banc is the effect of successive punitive damages awards in mass tort cases arising from the same course of conduct. We, as well as other courts, have expressed concerns in that regard. See In re School Asbestos Litig., 789 F.2d 996, 1005 (3d Cir.) ("powerful arguments have been made that, as a matter of constitutional law or of substantive tort law, the courts shoulder some responsibility for preventing repeated awards of punitive damages for the same acts or series of acts"), cert. denied, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117, and cert. denied, 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986); Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, 838-42 (2d Cir.1967); see also In re Federal Skywalk Cases, 680 F.2d 1175, 1188 (8th Cir.) (Heaney, J., dissenting), cert. denied, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982); Juzwin v. Amtorg Trading Corp., 705 F.Supp. 1053, 1056 (D.N.J.), as modified, 718 F.Supp. 1233, 1235 (D.N.J.1989); In re "Agent Orange" Prod. Liab. Litig., 100 F.R.D. 718, 728 (E.D.N.Y.1983), mandamus denied, 725 F.2d 858 (2d Cir.), cert. denied, 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984).
 
 
 73
 Nevertheless, the vast majority of courts that have addressed the issue have declined to strike punitive damages awards merely because they constituted repetitive punishment for the same conduct. See Solly v. Manville Asbestos Disease Fund, No. 91-3031, 1992 WL 125386, at * 7-8, 1992 U.S.App. LEXIS 14030, at * 21-22 (6th Cir. June 8, 1992) (construing federal due process and Ohio law), cert. denied, --- U.S. ----, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992); Simpson, 901 F.2d at 280-82 (construing federal due process); Jackson v. Johns-Manville Sales Corp., 781 F.2d 394, 402-07 (5th Cir.) (construing Mississippi law), cert. denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); Hansen v. Johns-Manville Prods. Corp., 734 F.2d 1036, 1041-42 (5th Cir.1984) (construing Texas law), cert. denied, 470 U.S. 1051, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985); Man, 728 F.Supp. at 1465-68 (construing federal due process and Hawaii law); Campbell v. ACandS, Inc., 704 F.Supp. 1020, 1021-23 (D.Mont.1989) (construing Montana law); Neal v. Carey Canadian Mines, Ltd., 548 F.Supp. 357, 376-77 (E.D.Pa.1982) (construing federal due process and Pennsylvania law), aff'd sub nom. Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481 (3d Cir.1985).
 
 
 74
 OCF seeks to have this court take the lead and strike the punitive damages award as repetitive, either under Virgin Islands law or on federal due process grounds. It argues that because of the volume of asbestos claims currently before the courts and likely to be filed in the future, the point of "overkill" has been reached with respect to punitive damages in asbestos litigation. OCF claims that asbestos manufacturers have been punished enough, and that the "avalanche" of compensatory claims is more than sufficient to serve the goals of deterrence and punishment. It urges this court, as the "Supreme Court of the Virgin Islands," Polius v. Clark Equip. Co., 802 F.2d 75, 80 (3d Cir.1986), to strike punitive damages claims in all asbestos cases tried in the territory.
 
 
 75
 Apparently OCF believes that our function as the highest reviewing court for the Virgin Islands affords us an opportunity that is not available to other federal courts which are constrained by diversity jurisdiction to be circumspect in predicting state tort law. See Jackson, 781 F.2d at 406 (noting limited authority of federal court sitting in diversity to extend state law substantially in the absence of explicit guidance from state courts). Yet federal courts have not been alone in declining to strike punitive damages awards on the ground that they constitute repetitive punishment for the same conduct. States courts as well have rejected such a contention, both on due process and common law tort grounds. See, e.g., Palmer v. A.H. Robins Co., 684 P.2d 187, 215-16 (Colo.1984); Balbos, 604 A.2d at 472; Fischer v. Johns-Manville Corp., 103 N.J. 643, 512 A.2d 466, 475-80 (1986); Davis v. Celotex Corp., 187 W.Va. 566, 420 S.E.2d 557, 564-66 (1992); Wangen v. Ford Motor Co., 97 Wis.2d 260, 294 N.W.2d 437, 466 (1980); Froud v. Celotex Corp., 107 Ill.App.3d 654, 63 Ill.Dec. 261, 264, 437 N.E.2d 910, 913 (1982), rev'd on other grounds, 98 Ill.2d 324, 74 Ill.Dec. 629, 456 N.E.2d 131 (1983); Fibreboard Corp. v. Pool, 813 S.W.2d 658, 687 (Tex.Ct.App.1991), cert. denied, --- U.S. ----, 113 S.Ct. 2339, 124 L.Ed.2d 250 (1993); see also Andrea G. Nadel, Annotation, Propriety of Awarding Punitive Damages to Separate Plaintiffs Bringing Successive Actions Arising Out of Common Incident or Circumstances Against Common Defendant or Defendants ("One Bite" or "First Comer" Doctrine), 11 A.L.R.4th 1261, 1262 (1982 & Supp.1992) (noting that courts "have generally held that no principle exists which prohibits a plaintiff from recovering punitive damages against a defendant or defendants simply because punitive damages have previously been awarded against the same defendant or defendants for the same conduct, or because other actions are pending against the defendant or defendants which could result in an award of punitive damages"). Indeed, OCF has brought no majority opinion from any court to our attention (and our research has not disclosed such a case) which holds that multiple punitive damages claims must be struck on either basis.
 
 
 76
 In concluding that multiple punitive damages awards are not inconsistent with the due process clause or substantive tort law principles, both state and federal courts have recognized that no single court can fashion an effective response to the national problem flowing from mass exposure to asbestos products. Indeed, these courts have noted the arbitrariness of imposing a cap on punitive damages awards in only a single jurisdiction. As the Supreme Court of Appeals of West Virginia recently stated:
 
 
 77
 it seems highly illogical and unfair for courts to determine at what point punitive damage awards should cease. Obviously, those plaintiffs whose cases were heard first would gain the punitive monetary advantage. Certainly, it would be difficult to determine where the cutoff line should be drawn as between the first, tenth, or hundredth punitive damages award. Moreover, because asbestos trials are held nationwide, it is doubtful that one state's ruling would necessarily bind other jurisdictions.
 
 
 78
 Davis, 420 S.E.2d at 565-66; see also Fischer, 512 A.2d at 480 ("At the state court level we are powerless to implement solutions to the nation-wide problems created by asbestos exposure and litigation arising from that exposure."); Jackson, 781 F.2d at 406 ("The relief sought by [the asbestos manufacturer] may be more properly granted by the state or federal legislature than by this Court.") (quotation omitted).
 
 
 79
 Similar concerns were expressed by the American Law Institute, which in a 1991 Reporters' Study, concluded that even state legislative efforts to limit punitive damages awards were an inappropriate and ineffective means for addressing the multiple punitive damages award problem.[17]
 
 
 80
 This kind of single-state action, however, is an ineffectual response to the problem, because one state cannot control what happens in other jurisdictions. In fact, the state that acts alone may simply provide some relief to out-of-state manufacturers at the expense of its own citizen-victims, a situation that hardly provides much law reform incentive for state legislators. Moreover, these formulas, which give the lion's share of the punitive award to the first victim able to win a judgment against a particular defendant, are unfair to subsequent plaintiffs and concomitantly risk providing too little deterrence to behavior of this type.
 
 
 81
 II American Law Institute, Enterprise Responsibility for Personal Injury 261 (1991) (emphasis added). As an alternative to state action, the Study supported a federal legislative solution "to authorize mandatory class actions for multiple punitive damages arising out of large-scale mass torts." Id. at 263.
 
 
 82
 These concerns are equally applicable to our role in reviewing punitive damages awards emanating from the Virgin Islands. Although we do not eschew our role as the final judicial voice on questions of law arising in the Virgin Islands, we are also cognizant that we have not been chosen for that role as directly as have the state supreme courts. This requires that we exercise restraint before imposing novel and/or experimental theories onto that territory's body of law.
 
 
 83
 We note further that our review as the Virgin Islands' highest court is not open-ended, but is guided by well-established principles. As we recognized in Government of the Virgin Islands v. Harris, 938 F.2d 401 (3d Cir.1991),
 
 
 84
 [a]bsent governing statute or precedent, a "hierarchy of sources for Virgin Islands law" is found under V.I. Code Ann. tit. 1, Sec. 4 (1967). Edwards v. Born, Inc., 792 F.2d 387, 389 (3d Cir.1986). Under Sec. 4, we look first to the common law rules set forth in the various Restatements. If no rules are available, we look to common law rules "as generally understood and applied in the United States." Id. See also Polius v. Clark Equipment Co., 802 F.2d 75, 77 (3d Cir.1986) (Where the Virgin Islands "has no governing statute ... [and] [w]here the Restatement is silent and a split of authority exists, courts should select the sounder rule.").
 
 
 85
 Id. at 411 (footnote omitted).
 
 
 86
 The Restatement, which provides the most persuasive evidence of the common law "as generally understood and applied in the United States," and which we are obliged to consult before exercising whatever common law authority we have in this case, does not preclude successive claims of punitive damages arising out of the same course of conduct, but instead permits consideration of the existence of multiple punitive damages claims against a defendant as a factor in assessing damages. See Restatement (Second) of Torts Sec. 908 cmt. e (1977) ("Another factor that may affect the amount of punitive damages is the existence of multiple claims by numerous persons affected by the wrongdoer's conduct."). When courts on the mainland, particularly from the other jurisdictions comprising the Third Circuit, have declined to strike repetitive punitive damage claims and awards in asbestos cases, we are unwilling to treat the similar awards to Virgin Islands plaintiffs as any less justified.
 
 
 87
 As we indicated in Polius, 802 F.2d at 77, it is only appropriate for us to select the sounder of several possible alternative rules for the Virgin Islands when a genuine split of authority exists among the other American common law jurisdictions. Even if we were convinced that the approach OCF advocates were the sounder one, OCF has not shown such a split of authority on the question of the propriety of successive punitive damages awards.
 
 
 88
 We do not disagree with the concerns that have been expressed about punitive damages awards, particularly in the asbestos cases. We differ instead with those who would have the judiciary resolve the conflicting policy arguments. We refrain from adopting such an activist role on what is essentially a policy matter, and believe that insofar as OCF would have us enunciate a prohibition of successive claims of punitive damages in mass tort litigation as a matter of Virgin Islands law, that decision is best left to the United States Congress or the legislature of the Virgin Islands.[18]
 
 
 89
 To the extent that OCF claims that punitive damages in asbestos cases are as a general matter unconstitutional, we are not persuaded by its arguments. Although we recognize that some courts and commentators have called for the abolition of punitive damages altogether, see, e.g., John Dwight Ingram, Punitive Damages Should Be Abolished, 17 Cap.U.L.Rev. 205 (1988); James B. Sales & Kenneth B. Cole, Jr., Punitive Damages: A Relic That Has Outlived Its Origins, 37 Vand.L.Rev. 1117 (1984), that position is not without its critics. In fact, the prevalent notion that we are facing skyrocketing or "runaway punitive awards," E. Barrett Prettyman, Jr., Punitive Damages, in A Plan to Improve America's System of Civil Justice From the President's Council on Competitiveness 75, 83 (1992), has been challenged by several commentators. See Michael Rustad, Demystifying Punitive Damages in Products Liability Cases: A Survey of a Quarter Century of Trial Verdicts 28 (Papers of the Roscoe Pound Found. 1991) [hereinafter Demystifying Punitive Damages ];[19] cf. Stephen Daniels & Joanne Martin, Myth and Reality in Punitive Damages, 75 Minn.L.Rev. 1, 13 (1990) [hereinafter Myth and Reality ]; Michael J. Saks, Do We Really Know Anything About the Behavior of the Tort Litigation System--And Why Not?, 140 U.Pa.L.Rev. 1147, 1256 (1992) [hereinafter Behavior of the Tort System ].
 
 
 90
 One study reported that in those relatively rare cases in which punitive damages are awarded at all,[20] these awards are frequently reduced on appellate review. Demystifying Punitive Damages at 30-32; Behavior of the Tort System, 140 U.Pa.L.Rev. at 1258-62. Another study concluded that "[t]he difference between punitive damages awarded and punitive damages paid is often dramatic." Demystifying Punitive Damages at 32. Finally, OCF itself candidly admits that in the vast majority of the asbestos cases against it which go to trial, plaintiffs come up empty. See Appellant's Supplemental Brief at 11 (citing App. at 1943); see also App. at 1842-939. We, of course, take no position on the debate regarding the issue of punitive damages in mass tort cases, but merely observe that the underlying facts appear to be far from clear, despite high-profile commentary in that connection.
 
 
 91
 In his powerful dissent, Judge Weis has set forth numerous arguments against punitive damages in mass tort cases in general and in asbestos cases in particular. We decline to respond in kind because we do not believe that a judicial opinion of an intermediate appellate court is the appropriate forum for a debate on the policies for and against punitive damages. Indeed, those members of the in banc court supporting the judgment of the court may themselves have differing views on whether and when punitive damages should be awarded.
 
 
 92
 Judge Weis argues that a "national solution is needed," and would have this court step in because Congress and the Virgin Islands legislature have failed to impose the solution he believes is needed. We believe, to the contrary, that unless a particular defendant has made the showing requisite to a finding of a due process violation as to it, the lower courts have an obligation to follow existing legal principles. In this connection, we note that while the debate on punitive damages has raged in commentary and even among judges, the Supreme Court of the United States has had various opportunities in recent years to restrict or redirect punitive damages awards, and it has pointedly failed to do so. In Haslip, the Supreme Court noted that punitive damages at common law were referred to by Blackstone, and that even early Supreme Court cases upheld such awards. 499 U.S. at 14-15, 111 S.Ct. at 1041-43. The Court had its most recent opportunity in TXO to overturn a punitive damages award that had received numerous adverse comments and publicity because of the exceedingly high ratio that the punitive damages bore to the compensatory damages (526 to 1), but it made no adverse comment on the award, reviewing only whether substantive due process principles compelled a reversal. In their separate concurrences, Justice Kennedy referred to the possibility of "legislative intervention that might prevent unjust punitive awards," --- U.S. at ----, 113 S.Ct. at 2724, and Justice Scalia (with Justice Thomas) stated that "[s]tate legislatures and courts have ample authority to eliminate any perceived 'unfairness' in the common-law punitive damages regime." Id. at ----, 113 S.Ct. at 2724. Indeed, Justice Scalia reiterated his earlier position in Haslip that "the Constitution gives federal courts no business in this area, except to assure that due process (i.e., traditional procedure) has been observed." Id. We would be intrepid indeed were we to use this case as a vehicle to iterate a blanket policy judgment against punitive damages in asbestos cases in light of the Supreme Court's studied silence on the policy issue.
 
 
 93
 We do not preclude a particular defendant from invoking the due process clause as a basis for relieving it of punitive damages in a specific case. However, the evidence produced by OCF falls far short of demonstrating any due process violation here.
 
 
 94
 In Simpson, the Second Circuit rejected the contention of another asbestos defendant, Pittsburgh Corning Corp., that a $2.3 million punitive damages award was a substantive due process violation. The court posited that if "the factfinder making the first award understood its assignment to be the selection of that sum of money appropriate to punish the tort-feasor for the full extent of its wrongful conduct, not merely a sum appropriate as punishment for the injuries to the plaintiffs in the lawsuit," 901 F.2d at 280, there might be a rationale for striking a subsequent award on due process grounds.[21] Inasmuch as OCF has not argued that this is an appropriate case to apply this "single punitive award" rationale, nor has it made the requisite factual showing to support such a claim, we need not decide whether we would accept such a theory.
 
 
 95
 The second basis posited in Simpson on which a successive punitive damage award might be viewed as violating due process is that the aggregate of prior awards has reached the maximum amount tolerable under the Due Process Clause. This argument assumes that prior juries functioned in the traditional manner, limiting their awards of punitive damages in light of the injury inflicted on the plaintiff in a particular case.[22] This is essentially the argument made by OCF in this case. However, we agree with the Second Circuit that such an argument can be evaluated only if the judge has been "provided with a factual basis sufficient for evaluating the entire scope of the defendant's wrongful conduct.... Only with such factual information can the judge determine that the aggregate of prior awards punishes the entirety of the wrongful conduct to the limit of due process." Id. at 281.
 
 
 96
 Assuming arguendo that we would accept this analysis, the factual record made by the defendant must, as a prerequisite to relief on due process grounds, include evidence demonstrating the amount of punitive damages it has actually paid in the past. In this case, OCF has simply failed to make such a showing.
 
 
 97
 As noted above, OCF filed a post-trial affidavit listing other punitive damages jury verdicts entered against it. App. at 1941-49. Significantly, OCF also stated that post-trial motions or appeals were pending as to each and every non-settled verdict listed in its submission. It stated further that as to those verdicts which it settled, an unspecified albeit allegedly "substantial amount of the settlement reflect[ed] the punitive damages award[ed]." App. at 1946. As to the latter, Simpson stated that, "it is far from clear that sums paid in private settlements may validly be counted in determining when state-compelled punitive damages awards exceed the limits of the Fourteenth Amendment." 901 F.2d at 282. The failure to designate particular amounts of the settlements as representing punitive damages makes inclusion of these amounts problematic. The same is true of OCF's list of non-final awards of punitive damages. Thus, OCF has failed to prove that the aggregate award of punitive damages against it has been sufficient to meet the twin goals of punishment and deterrence underlying such awards.
 
 
 98
 Nor has OCF shown that it will not be able to pay future awards of either compensatory or punitive damages. OCF's 1990 Annual Report filed with the district court post-trial stated that as of December 31, 1990, OCF had approximately $1.26 billion in unexhausted insurance coverage under product liability insurance policies applicable to asbestos-related personal injury claims. App. at 2007. OCF charged to earnings $24 million in 1990 and $50 million in 1989 for the uninsured costs of asbestos claims and had related reserves of $115 million and $131 million as of December 31, 1989 and 1990, respectively. App. at 2008.[23]
 
 
 99
 In addition, the Report stated that the "disease mix of asbestos personal injury claims against the Company appears to have declined in severity in recent years. Moreover, many of the newer claims involve workers from occupations with limited, if any, exposure to the Company's asbestos products. Accordingly, the Company anticipates achieving a gradual reduction in its per case indemnity payments." App. at 2006. Finally, the Report concluded that
 
 
 100
 [a]lthough any opinion is necessarily judgmental and must be based on information now known to the Company, in the opinion of management, based on the Company's experience with these claims to date, the Company's assessment of the number, nature and severity of the pending claims and the trends in the filing of such claims, and the Company's analysis of its available insurance coverage and existing reserves, and of the Company's future business and financial prospects, the additional uninsured costs which may arise out of pending personal injury and property damage asbestos claims and additional similar asbestos claims filed in the future will not have a materially adverse effect on the Company's financial position.
 
 
 101
 App. at 2008 (emphasis added).
 
 
 102
 In sum, OCF simply has not made a "showing that the total [amount of punitive damages assessed so far] is even close to whatever limit due process might impose on the total punitive damages that may be assessed ... for ... misconduct with respect to asbestos warnings." Simpson, 901 F.2d at 281; see Restatement (Second) of Torts Sec. 908 cmt. a (1977); cf. Campbell, 704 F.Supp. at 1023 ("the desired effect is to deter all individuals or entities involved in the manufacture and distribution of consumer products from placing the public at risk by engaging in similar conduct"). Nor has OCF shown on this record that it will be unable to satisfy current and future asbestos claims. Although the costs associated with asbestos litigation may have wiped out any profits OCF made from the sale of its Kaylo product, OCF failed to submit any evidence at trial concerning the profitability of its Kaylo product,[24] or concerning the profits of the other manufacturers. In any event, neither Virgin Islands law nor due process requires striking all punitive damages claims simply because the harm caused by a defective product was so severe as to wipe out all profit.
 
 
 103
 Of course, we do not decide whether another asbestos manufacturer might be able to satisfy this evidentiary hurdle with a different factual record. Nonetheless, we believe that the district courts in this circuit should determine whether a punitive award to a plaintiff in a particular case should be struck by carefully scrutinizing the "punitive damages overkill" evidence submitted to them, both with respect to past awards actually paid by the defendant and the defendant's ability to satisfy future punitive damages awards. These courts should also consider whether the financial status of the defendant is such that future claimants will be unable to collect even compensatory damages because of the limited pool of resources available. It is the defendant's burden to make this evidentiary showing, a burden OCF has not satisfied on the record before us.
 
 
 104
 Although we reject OCF's due process challenge, we nonetheless agree with OCF that further remittitur of the punitive damage award in this case is appropriate. See Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 773-75 (3d Cir.1987); Williams v. Martin Marietta Alumina, Inc., 817 F.2d 1030, 1040-41 (3d Cir.1987). In reaching this conclusion, we take into consideration all the factors listed in comment e to Restatement of Torts (Second) Sec. 908: the defendant's wealth, its act, the extent of harm, the multiplicity of claims, and, as approved in Haslip, the awards of punitive damages in similar cases.
 
 
 105
 Our review of the list of jury verdicts submitted by OCF to the district court indicates to us that even the $2 million dollar figure greatly exceeds the level of punitive damages awarded in other similar asbestos cases. While we commend the district court's discipline in reducing the punitive damages from $25 million to $2 million, we believe that the district court gave insufficient consideration to the effect of successive punitive awards in asbestos litigation. This factor, above all, leads us to conclude that the maximum amount of punitive damages that could reasonably have been awarded in this case is $1 million.
 
 V.
 CONCLUSION
 
 106
 Following the filing of the opinion of the panel of this court reaching the same conclusion, Dunn elected to file a remittitur of punitive damages awarded in excess of $1,000,000.
 
 
 107
 For the foregoing reasons, we will vacate the judgment of punitive damages and remand the case to the district court with instructions to enter a new judgment for punitive damages in the amount of $1,000,000. OCF to bear all costs on appeal.
 
 ALITO, Circuit Judge, concurring:
 
 108
 I concur in the judgment. I also join Parts I, II, III, and V of the opinion of the court. I do not fully agree with the analysis in Part IV of the court's opinion, which discusses the question whether the punitive damage award in this case was excessive under Virgin Islands law or under the Due Process Clause. Hence, I write briefly to explain my disagreement with the court's discussion of those questions.
 
 
 109
 In considering the propriety of the punitive damages award under Virgin Islands law, I begin with 1 V.I.C. Sec. 4, which states:
 
 
 110
 The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.
 
 
 111
 In order to understand the meaning of this provision, I think it is helpful to examine its origins. Before 1917, the Virgin Islands were generally subject to "[t]he Common and Statute Law of Denmark." Colonial Law of April 6, 1906, Sec. 67. After the United States acquired the Virgin Islands, Congress, in the Act of March 3, 1917, ch. 171, Sec. 2, 39 Stat. 1132, provided for this body of Danish law to remain in effect "insofar as compatible with the changed sovereignty and not in conflict with the provisions of [this] Act." This provision was effectively abrogated, however, in 1920 and 1921, when the Colonial Councils of the Municipality of St. Croix and the Municipality of St. Thomas and St. John, acting pursuant to authority delegated by Congress in the 1917 Act, adopted comprehensive new Codes of Laws. Each of these Codes contained an identical provision stating that (tit. iv, ch. 13, Sec. 6): "[t]he common law of England as adopted and understood in the United States shall be in force in this District, except as modified by this ordinance."
 
 
 112
 In Callwood v. Virgin Islands Nat'l Bank, 221 F.2d 770, 775 (3d Cir.1955), our court, in an opinion by Judge Maris, interpreted this provision as follows:
 
 
 113
 [T]he Virgin Islands have adopted the rules of the common law of England as followed and understood in the United States and we think that the district court in applying those rules is justified in considering the well considered expressions of them which the American Law Institute has incorporated in its Restatements of the Law.
 
 
 114
 At the time of the Callwood decision, a commission, which included Judge Maris as one of its members, was preparing what later became the Virgin Islands Code. This Code, including title 1, Sec. 4, was enacted in 1957. The Revision Note for this provision states that the earlier provisions had been
 
 
 115
 rewritten more accurately to express the concept of the Common Law as constituting a body of rules established by precedent, as distinguished from a body of statutory law, and to extend the application of the rules to the restatements of the law prepared and approved by the American Law Institute. See Callwood v. V.I. Nat. Bank, C.A.3d 1955, [3 V.I. 540] 221 F.2d 770.
 
 
 116
 In light of this history, I interpret 1 V.I.C. Sec. 4 to mean that the law of the Virgin Islands, in the absence of a relevant statutory provision, is "the body of rules established by precedent"[1] "as generally understood and applied in the United States"[2] and that, as suggested in Callwood, the Restatements provide a presumptively authoritative summary of this body of precedent. I do not interpret 1 V.I.C. Sec. 4 to mean that the Restatements, whether adopted before or after 1957, are tantamount to Virgin Islands statutes. On the contrary, I agree with the analysis of this question in Varlack v. SWC Caribbean Inc., 550 F.2d 171 (3d Cir.1977). Addressing a conflict between a provision of the Restatement (First) of Torts (issued in 1934) and a provision of a Tentative Draft of the Restatement (Second) of Torts, the court observed that "we read the statute as looking to the Restatements only as an expression of 'the rules of common law.' " 550 F.2d at 180 (emphasis in original).[3] Thus, 1 V.I.C. Sec. 4 does not incorporate all of the Restatement provisions in effect in 1957 as if they were actual statutory text; nor does it delegate to the American Law Institute the authority to enact changes in the law of the Virgin Islands in all of the areas covered by the Restatements. While some of our opinions cite provisions of the Restatements as if they were statutory law, I respectfully submit that these references (which I take to be merely a form of shorthand) are potentially misleading.
 
 
 117
 It is also inaccurate, in my view, to suggest that we are free to do in this case whatever some state supreme court might feel free to do in a comparable case before it. The role of the highest court of each state is defined by its own state's constitution, statutes, and legal traditions, and many of these courts may have greater authority to contribute to the development of state common law than we have under 1 V.I.C. Sec. 4.
 
 
 118
 Because of 1 V.I.C. Sec. 4, our task, in considering whether the punitive damage award in this case is excessive under Virgin Islands law, is to determine whether the award is consistent with the general body of relevant precedents handed down by American courts. Working within this framework, I agree with the court that the award in this case, after remittitur, is permissible. To the extent that the court mounts a defense of the merits of these precedents, however, I disassociate myself from that analysis. When the common law as understood and applied in the United States provides a clear rule, 1 V.I.C. Sec. 4 requires us to apply that rule regardless of our judgment as to the rule's merits. Congress and the Virgin Islands Legislature have the authority and discretion to pass new statutes and thereby adopt for the Virgin Islands different rules contrary to and arguably superior to the common law approach, but, under current law, we do not have such authority. If we had such authority, however, I would find much in the existing precedents that merits critical reexamination.[4]
 
 
 119
 With respect to OCF's argument that the punitive damage award in this case violates due process, I agree with the court's conclusion that this argument is unsound. I am puzzled, however, by the fact that the court, in addressing this question, seems to place significant reliance on studies and articles that attempt to debunk the critics of punitive damages. Maj. Op. at 1387-88. I am at a loss to understand precisely what bearing these studies have on the constitutional question before us. I certainly do not think that the content of the Due Process Clause can be ascertained by tallying up the entries in the Index to Legal Periodicals. And I am not willing to appear to endorse the views on policy questions expressed in the writings that the court cites or to vouch for the accuracy of their underlying empirical research.
 
 
 120
 In sum, while I do not entirely agree with the analysis in Part IV of the court's opinion, I agree with its ultimate conclusion. I therefore concur in the judgment, and I join the portions of the court's opinion that were previously noted.
 
 
 121
 WEIS, Circuit Judge, dissenting.
 
 
 122
 I dissent from the judgment of the court permitting punitive damages in this case.
 
 
 123
 Asbestos litigation is unique. The large number of persons exposed to asbestos has caused a proliferation of claims, the likes of which courts have never seen, causing serious concern that the traditional tort system cannot adequately process the litigation. As this Court said in In re School Asbestos Litigation, 789 F.2d 996, 1000 (3d Cir.1986), asbestos litigation presents "an unparalleled situation in American tort law."
 
 
 124
 In 1986, an estimated 30,000 personal injury suits had been filed against asbestos manufacturers and producers. Id. That figure has since increased substantially. By 1990, 30,401 asbestos cases were pending in the federal courts alone, with about double that amount in the state courts, for a total of approximately 90,000 cases. Judicial Conference Ad Hoc Comm. on Asbestos Litig., Report to the Chief Justice of the United States and Members of the Judicial Conference of the United States (Mar. 1991), reprinted in Asbestos Litig. Rep., Mar. 14, 1991, at 22,698, 22,702-03. A study completed by the National Center for State Courts reports that there may be as many as 129,000 cases pending in state courts alone, making the total of federal and state cases approximately 160,000. State Judges Asbestos Litig. Comm., Megatorts: The Lessons of Asbestos Litigation (July 21, 1992), reprinted in Mealey's Litig. Rep.--Asbestos, Nov. 20, 1992, at B-1. Another report estimates that between 1990 and 2049 another 668,363 asbestos-related claims will be filed. Eric Stallard & Kenneth Manton, Estimates and Projections of Asbestos-Related Mesothelioma and Exposures Among Manville Personal Injury Settlement Trust Claimants, 1990-2049, at 42 (Draft Nov. 9, 1992).
 
 
 125
 It is not only claims for personal injuries and deaths resulting from asbestos that have inundated the courts. In addition, thousands and thousands of property damage cases further diminish the available pool of resources. See, e.g., In re School Asbestos Litig., 789 F.2d at 1005.
 
 
 126
 As might be expected, the flood of asbestos cases has taken its toll on the defendant asbestos manufacturers. The Ad Hoc Committee reported that of the twenty-five major asbestos companies, eleven had filed petitions in bankruptcy. Judicial Conference Ad Hoc Comm., supra, at 22,705. Later reports indicate that fifteen or sixteen companies have filed for bankruptcy. State Judges Asbestos Litig. Comm., supra, at B-2; Don J. DeBenedictis, Model for Asbestos Settlements, A.B.A.J., Apr. 1993, at 22. Moreover, that "number does not include the numerous smaller distributors that have been targeted in the wake of absent manufacturers and who have in turn become insolvent." Peter H. Schuck, The Worst Should Go First: Deferral Registries in Asbestos Litigation, 15 Harv.J.L. & Pub.Pol'y 541, 555 (1992).
 
 
 127
 The first of the major asbestos manufacturers to enter bankruptcy was Johns-Manville, which sought to use Chapter 11 essentially as a giant interpleader action. As part of the Manville reorganization, a trust was created to settle pending and future asbestos claims. Although the trust concept had the potential for equitably distributing assets to present and future claimants, the bankruptcy proceeding was itself very expensive and the results ultimately proved to be unsatisfactory.
 
 
 128
 Even though punitive damages were not allowed, the trust was essentially insolvent after operating for only a year and a half. In re Joint E. & S. Dist. Asbestos Litig., 129 B.R. 710, 754 (E. & S.D.N.Y.1991), vacated on procedural grounds, 982 F.2d 721 (2d Cir.1992). Reports indicate that the trust received 192,347 claims, Stefan Fatsis, Lower Sums for Victims of Asbestos, quoted in Phila. Inquirer, Mar. 18, 1992, at C8, and that the trust's funds of approximately $2.6 billion were overshadowed by present and future liabilities estimated as high as $7 billion, see In re Joint E. & S. Dist. Asbestos Litig., 129 B.R. at 765. The swift depletion of assets was caused by high transaction costs, the failure to anticipate the magnitude of claims, and the fact that the average settlement was much higher than expected. Id. at 754-62. Additionally, the trust paid on a first come, first served basis, rather than on priority determined by the extent of injury.
 
 
 129
 The district court intervened to impose measures for a more equitable distribution of the funds and eventually approved an arrangement that altered the distribution process so that those most seriously injured were paid first. Id. at 768-70. In addition, a serious attempt was made to predict future claims so that present and future claimants would be paid an equitable percentage of their claims' value. Id.
 
 
 130
 In commenting on the settlement, the district court noted the grim prospects for future asbestos claimants in the absence of a solution. The current defendants "do not have, and they probably will not have, assets to pay for their current and contingent asbestos liabilities given the present mode of disposing of asbestos claims." Id. at 907. The Manville experience, thus, demonstrates that even purely compensatory payments for future claims are in jeopardy.
 
 
 131
 Subsequent claims and bankruptcy filings have increased the likelihood that future claimants will not be able to recover for their injuries. As the Ad Hoc Committee said:
 
 
 132
 "[A] large number of individuals have claims ... that are not yet ripe for adjudication. Because many of the defendants in these cases have limited assets that may be called upon to satisfy the judgments obtained under current common tort rules and remedies, there is a 'real and present danger that the available assets will be exhausted before those later victims can seek compensation to which they are entitled.' Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314, 1330 (5th Cir.1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986)."
 
 
 133
 Judicial Conference Ad Hoc Comm., supra, at 22,715-16. As one of its recommendations to Congress, the Committee suggested legislation "requiring treatment of available assets to take into account future claimants." Id. at 22,716.
 
 
 134
 It is within this setting of burgeoning litigation, corporate collapse, and future compensatory inadequacy that the present case involving punitive damages arises.
 
 
 135
 This Court is confronted for the first time with an asbestos case brought under Virgin Islands law where punitive damages have been awarded. We are in a position similar to that of state supreme courts in determining the common law and Restatements applicable within this jurisdiction. We write on a clean slate and shoulder a clear responsibility to resolve a difficult issue. We are not bound, nor excused, by mistaken determinations in other jurisdictions in the past.
 
 
 136
 The desirability of permitting punitive awards has been subjected to vigorous assault in recent years, particularly in cases like the one before us. Whether the theories underlying exemplary damages hold true in the mass tort context has been questioned in such cases as: In re Bendectin Prod. Liab. Litig., 749 F.2d 300, 305-07 (6th Cir.1984); In re Northern Dist. of Cal., Dalkon Shield IUD Prod. Liab. Litig., 693 F.2d 847, 851-52 (9th Cir.1982); In re Federal Skywalk Cases, 680 F.2d 1175, 1179-83 (8th Cir.1982); and In re "Agent Orange" Prod. Liab. Litig., 100 F.R.D. 718, 725 (E.D.N.Y.1983). In none of those instances, however, did the problem match the magnitude of the asbestos litigation crisis. As the State Judges Litigation Committee reports, "There is no more controversial issue in mass tort litigation than punitive damages." State Judges Asbestos Litig. Comm., supra, at B-9.
 
 
 137
 I do not propose to enter the debate here over the merits of punitive damages in general.[1] For purposes of this case, I accept the premise that in appropriate cases punitive damages may be assessed in the Virgin Islands. See Restatement (Second) of Torts Sec. 908(2);[2] Acosta v. Honda Motor Co., 717 F.2d 828, 833-41 (3d Cir.1983). However, it is necessary to discuss the justifications for punitive damages and whether those purposes are served in the mass tort area.
 
 
 138
 I propose to meet head-on an issue presented here--that is, whether unfairness to injured persons whose claims will come due after available funds have been exhausted requires a common law bar on continuing punitive awards. I will also review punitive awards in terms of unfairness to asbestos defendants and due process. See TXO Prod. Corp. v. Alliance Resources Corp., --- U.S. ----, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); Pacific Mut. Life Ins. v. Haslip, 499 U.S. 1, 26-27, 111 S.Ct. 1032, 1053, 113 L.Ed.2d 1 (1991). Although there are serious questions of bias, prejudice, and improper closing arguments to the jury present in this record, I will not discuss them here.
 
 I.
 COMMON LAW PUNITIVE DAMAGES
 
 139
 The Restatement (Second) of Torts Sec. 908(2) provides that "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." (emphasis supplied). Comment a explains that "[t]he purposes of awarding punitive damages ... are to punish the person doing the wrongful act and to discourage him and others from similar conduct in the future."
 
 
 140
 When considering punitive awards, several basic principles must be emphasized. First, punitive damages are designed for retribution and deterrence. "They are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974). The fairness inherent in due process requires that punitive assessments not exceed those amounts necessary to inflict retribution and prevent reoccurrence. See, e.g., Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir.1992). When retribution and deterrence are accomplished without the imposition of punitive damages, use of that weapon is no longer justified.
 
 
 141
 Second, punitive damages are a windfall. They do not reimburse losses that plaintiffs have suffered, but provide an amount over and above that necessary for fair compensation. See, e.g., City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 267, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (1981).
 
 
 142
 Third, there is no compelling reason why injured but fully compensated plaintiffs should receive punitive awards. The aims of retribution and deterrence can be accomplished by making punitive damages payable to the state.[3] Indeed, nine states have enacted statutes that designate that a portion of any punitive award goes to the state, ranging from 20% in New York to 75% in Iowa and Georgia. Colo.Rev.Stat. Sec. 13-21-102(4); Fla.Stat.Ann. Sec. 768.73; Ga.Code Ann. Sec. 51-12-5.1(e)(2); Ill.Ann.Stat. ch. 110, para. 2-1207; Iowa Code Ann. Sec. 668A.1(2)(b); Mo.Ann.Stat. Sec. 537.675; N.Y.Civ.Prac.L. & R. Sec. 8701; Or.Rev.Stat. Sec. 18.540; Utah Code Ann. Sec. 78-18-1(3).[4]
 
 
 143
 In the asbestos context, punitive awards are not needed for retribution and deterrence. Actually, there is little conduct to deter because few asbestos-containing products are still manufactured in the United States.[5] Owens-Corning, the defendant in this case, ceased manufacturing asbestos-containing Kaylo in November 1972, more than twenty years ago, and no longer produces or distributes any asbestos-containing products. That being so, this punitive award cannot be justified by a concern that Owens-Corning will continue its challenged practice in the future. See Magallanes v. Superior Court, 167 Cal.App.3d 878, 213 Cal.Rptr. 547, 552 (Ct.App.1985) ("[T]he objective of deterrence has little relevance where the offending goods have long since been removed from the marketplace.").
 
 
 144
 Moreover, the avalanche of compensatory claims against asbestos manufacturers has surely served as more of a punishment and deterrent than individual punitive assessments in isolated cases against manufacturers of other types of products. As one judge has explained:
 
 
 145
 "No manufacturer could engage consciously in wrongdoing that would expose it to such overwhelming strict liability with any reasonable expectation of doing so profitably. On the contrary, the prospect of exposure to massive litigation in strict liability provides the impetus for manufacturers to take affirmative steps to ensure the safety of their products, since mere non-negligent behavior is no guarantee against strict liability.
 
 
 146
 The significance of punitive damages as a deterrent depends upon the size of the penalty increase relative to the 'base penalty' exacted by strict liability compensatory awards. Because of the dimensionless character of the prospects for future litigation in this instance, the 'base penalty,' for all practical purposes, is illimitable. Correspondingly, the significance of punitive damages as a deterrent diminishes to the vanishing point."
 
 
 147
 Jackson v. Johns-Manville Sales Corp., 727 F.2d 506, 527 (1984), vacated, 750 F.2d 1314 (5th Cir.1985) (en banc).
 
 
 148
 That point is illustrated strikingly by Owens-Corning's experience. Compensatory awards have consumed all profits made from the sale of asbestos-containing products. Total gross sales of Kaylo were $142,720,000. As of May 31, 1991, defendant had paid claims for "hundreds of millions of dollars" in 62,588 cases and incurred litigation expenses in excess of $100 million. In 1990 alone, $117 million was paid on 12,300 claims. In addition, 86,192 cases are presently pending with hundreds more being filed each month. In these circumstances, punitive awards are certainly not necessary to provide an effective deterrent.
 
 
 149
 Some courts and commentators have expressed concerns that the denial of punitive damages in a mass tort setting might in effect reward defendants because the harm caused was so extensive.[6] However, such concerns have no validity here. It is disingenuous to speak of reaping a "reward" when compensatory damages dwarf any profits made from asbestos-containing products and those damages by themselves have forced manufacturers into bankruptcy.[7]
 
 
 150
 The Ad Hoc Committee cited a 1984 Rand study reporting that in a sample period between 1980 and 1982, punitive damages totalling $4,934,000 had been awarded in asbestos cases. Judicial Conference Ad Hoc Comm., supra, at 22,724 n. 54. More recent figures are substantially higher.[8] In testimony before a House Subcommittee on February 26, 1992, Judge William Schwarzer, the Director of the Federal Judicial Center, said:
 
 
 151
 "Punitive damages compete with compensatory damages for the increasingly scarce resources of asbestos defendants and their insurers. Until the claims of future claimants become liquidated, distribution of punitive damages to current claimants creates a risk of exhausting funds before potential claimants discover their injuries. Some mechanism to avoid this outcome, at least until more precise information becomes available about future claims, may be necessary for a national solution that has meaning for future claimants."
 
 
 152
 Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcomm. on Intellectual Property and Judicial Administration of the House Comm. on the Judiciary, 102d Cong., 2d Sess. 132-33 (1992) (statement of Hon. William W. Schwarzer).
 
 
 153
 Judge Schwarzer also noted that less than 1% of asbestos cases proceed to judgment. Id. at 137. Thus, punitive damages as such are only available in that small percentage of cases. Moreover, they are not awarded in every trial even though the same defendant and the same conduct is at issue. Nevertheless, the potential for punitive awards is a weighty factor in settlement negotiations and inevitably results in a larger settlement agreement than would ordinarily be obtained. To the extent that this premium exceeds what would otherwise be a fair and reasonable settlement for compensatory damages, assets that could be available for satisfaction of future compensatory claims are dissipated. Id. at 137-38.
 
 
 154
 Rather early in the wave of asbestos litigation, a minority of the Court of Appeals for the Fifth Circuit forcefully questioned whether the industry's resources would be adequate to compensate future claimants. Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314, 1330 (5th Cir.1985) (en banc) (Clark, J., joined by four others dissenting), later appeal, 781 F.2d 394, 415-17 (5th Cir.1986) (en banc) (Clark, J., joined by four others dissenting). A majority of that Court decided to certify to a state court the question of whether plaintiffs could recover punitive damages in asbestos cases. The dissenting judges, arguing that the problem was national in scope, advocated taking a more forceful stand. Noting that the "field of asbestos litigation [had] exploded," they pointed out that an "already astronomical and still growing number of plaintiffs [are] seeking individual recoveries against a finite pool of assets belonging to a relatively small group of defendants." Jackson, 750 F.2d at 1330.
 
 
 155
 Taking issue with the decision to certify the question to the state court, the dissent observed that "[a] state seeking to protect its own citizens can only shape its law to maximize the recovery of its own early plaintiffs, so that at least those individuals will not be impeded in the legal scramble for a share of insufficient assets." Id. The situation has only worsened since the time of the Jackson opinions, and a panel of that same Court in 1990 conceded its "misgivings" over awarding punitive damages in asbestos cases, but found itself shackled by binding precedent. King v. Armstrong World Indus., 906 F.2d 1022, 1033 (5th Cir.1990).
 
 
 156
 As the Jackson dissent commented and as we discussed in In re School Asbestos Litigation, 789 F.2d at 1001, parochial concerns tend to influence the decision to make punitive damages available in cases of this nature. That approach was apparent, for example, in Fischer v. Johns-Manville Corp., 103 N.J. 643, 512 A.2d 466 (1986). In discussing the suggestion that a limitation on punitive awards be imposed, the Fischer Court said: "Such a cap would be ineffective unless applied uniformly. To adopt such a cap in New Jersey would be to deprive our citizens of punitive damages without the concomitant benefit of assuring the availability of compensatory damages for later plaintiffs. This we decline to do." Id. at 478. What that opinion failed to acknowledge was that giving windfall punitive awards to early plaintiffs poses the likely prospect that some future New Jersey plaintiffs will be unable to recover compensatory damages for their injuries.
 
 
 157
 The New Jersey Supreme Court also stated that it failed "to see the distinction, in the case of Johns-Manville [before its bankruptcy], between the effect of compensatory damages and that of punitive damages." Id. at 477. To some extent, the Court was correct. Every dollar expended on punitive awards, as well as those expended in compensatory damages, will diminish, eventually to the point of exhaustion, resources available for paying future plaintiffs' claims. There is, however, an important distinction. Compensatory damages are a remedy for injuries suffered. Punitive awards are not. A dissenting justice in Fischer posed an apt rhetorical question: "But why, for example, should a few Dalkon Shield users receive several millions in punitive-damages awards, while others receive nothing from the bankrupt A.H. Robins Co.?" Id. at 488 n. 3 (O'Hern, J., dissenting).
 
 
 158
 Unquestionably, a national solution is needed. Despite the deteriorating situation, Congress has declined to act, and class actions are an inadequate remedy. In the meantime, the drain on available resources continues. It is time--perhaps past due--to stop the hemorrhaging so as to protect future claimants.
 
 
 159
 The parochial concerns that have influenced some states to allow punitive damages would justify the majority's decision here. But at some point, some jurisdiction must face up to the realities of the asbestos crisis and take a step that might, perhaps, lead others to adopt a broader view. Courts should no longer wait for congressional or legislative action to correct common law errors made by the courts themselves. Mistakes created by courts can be corrected by courts without engaging in judicial activism.[9] It is judicial paralysis, not activism, that is the problem in this area. As we said in Frilette v. Kimberlin, 508 F.2d 205, 212 (3d Cir.1974) (en banc), it is not necessary to wait for legislative action when the error was judge made and it can be corrected in the same fashion. "We cannot escape the fact that what has been done is in the nature of what, in the words of Chief Justice Hughes, might be called a 'self-inflicted wound.' " Id.
 
 
 160
 I am persuaded that, at this point, the available resources of asbestos manufacturers will be exhausted before all deserving claimants have received compensatory damages.[10] Predictions of future events, of course, always carry some risk of error. In this instance, however, the storm warnings are too foreboding to be brushed aside. Absolute certainty likely will appear only after disaster has struck--when the time for effective anticipatory action has vanished. If there is to be error in forecasting, I would prefer that it be in favor of redress for future claimants, rather than largesse for those who have received adequate relief.
 
 
 161
 The cruel reality underlying the issue in this case cannot be ignored. As Chief Judge Clark said in the Jackson case: "This seminal case concerns much more than [an] individual claim.... We know better. Our dockets tell us so...." 781 F.2d at 416. It is already late in the day, but we have an obligation to take what steps we can.
 
 
 162
 It should require no extended discussion to conclude that in establishing a proper priority, compensation for victims should rank first. Next must come necessary but reasonable administrative costs attributable to compensation.[11] 1] Far down the list--if not at the very bottom--should come punitive awards, which are by definition over and above adequate compensation. Exemplary awards are an element that can equitably and easily be eliminated.
 
 
 163
 Under current conditions, even if the purposes of punishment and deterrence were served, it is fanciful to believe that such factors are worthy of consideration in assessing priorities to limited funds. In this context, the benefits of punitive awards are outweighed by their costs to society. Cf. David G. Owen, The Moral Foundations of Punitive Damages, 40 Ala.L.Rev. 705, 724-25, 737-39 (1989).[12] Punishment and deterrence cannot justify extra-compensatory awards when they penalize future claimants by depleting available funds.
 
 
 164
 Society's interest in protecting future claimants demands that present plaintiffs--both those who go to trial and those who settle--forego the "bonus" offered by punitive damage verdicts or high settlements achieved by their threat. Courts must recognize that the public interest outweighs parochial concerns in having citizens within their jurisdictions "get theirs" now. Such a selfish approach, after all, is unjust, not only to future claimants in other parts of the country, but within the courts' own jurisdictions as well.[13]
 
 
 165
 I have no doubt that this Court has the power to prohibit punitive awards in asbestos cases within the Virgin Islands and I am convinced that it has an obligation to do so in order to protect the interests of those whose claims for compensation will be jeopardized.
 
 II.
 DUE PROCESS
 
 166
 Some of the same considerations that are important in deciding whether punitive awards are appropriate under local law also play a part in determining whether the assessment of such sums violates due process.
 
 
 167
 Although plaintiff here asserts that Owens-Corning failed to provide a sufficient basis for a ruling on due process, the record establishes that pretrial motions to dismiss punitive damage claims were denied by the district court. After the jury had begun its deliberations on punitive damages in the bifurcated trial, the defense renewed its contention that they would be unconstitutional because of previous awards. Counsel stated that four punitive awards had been entered against Owens-Corning, but indicated that there might be others as well.
 
 
 168
 The district court concluded that a punitive award would not be unconstitutional because "even in view of [defendant's] negative net worth [the amount] is certainly not enough to sting the company ... [a]nd it's not unconstitutional because your client to this date has been subjected to a huge burden with respect to punitive damages."
 
 
 169
 In post-trial proceedings, the district court directed both parties to furnish information on punitive awards in other asbestos cases during the preceding two years. In response, plaintiff listed thirty-eight cases--two of which included punitive awards against Owens-Corning of $4,150,000 and $5,000,000. In his statement, plaintiff admitted that "other juries had reached the same conclusion regarding OCF's conduct and awarded punitive damages accordingly."
 
 
 170
 Defendant filed an extensive compilation, and an analysis of the thirty-eight cases listed by plaintiff, together with an affidavit detailing the punitive awards against Owens-Corning to that date. In its submission, defendant listed $19,975,000 awarded against it in punitive damages.
 
 
 171
 On this record, defendant adequately preserved its objections asserting a denial of due process.
 
 
 172
 The Supreme Court has indicated that punitive awards may violate substantive due process. In TXO, --- U.S. at ----, 113 S.Ct. at 2720, the Court concluded that as to the verdict at issue there, "we are not persuaded that the award was so 'grossly excessive' as to be beyond the power of the State to allow." In Haslip, 499 U.S. at 35 n. 11, 111 S.Ct. at 1052 n. 11, the Court noted that punitive awards may be required to comport with "procedural and substantive [due process] protections."
 
 
 173
 Due process concerns are present in two aspects that have a correlation to the criminal field--proportionality and repetitiveness. The Supreme Court has made it clear that the Excessive Fines Clause of the Eighth Amendment and the Double Jeopardy Clause of the Fifth Amendment are not directly applicable to suits between private litigants. See Browning-Ferris Indus. v. Kelco Disposal, Inc., 492 U.S. 257, 260, 109 S.Ct. 2909, 2912, 106 L.Ed.2d 219 (1989); United States v. Halper, 490 U.S. 435, 451, 109 S.Ct. 1892, 1903, 104 L.Ed.2d 487 (1989); see also Hansen v. Johns-Manville Prod., 734 F.2d 1036, 1042 (5th Cir.1984). Nevertheless, the analogy between "punishment" in the criminal field and exemplary awards in civil litigation is strong enough that the rationale in the former area is useful in analyzing the scope of the latter.
 
 
 174
 As one commentator remarked, "[T]o punish the guilty beyond their guilt is not different from punishment of the innocent, and it cannot be done in a manner consistent with ordinary notions of justice." Dan B. Dobbs, Ending Punishment in "Punitive" Damages: Deterrence-Measured Remedies, 40 Ala.L.Rev. 831, 854 (1989). "By definition, punitive damages are based upon the degree of defendant's culpability." Massachusetts Bonding & Ins. v. United States, 352 U.S. 128, 133, 77 S.Ct. 186, 189, 1 L.Ed.2d 189 (1956).
 
 
 175
 Neither TXO nor Haslip provide much guidance in the mass tort area because the wrongful conduct in each case affected only the other party to the suit. Obviously, such limited disputes are quite unlike asbestos litigation, where literally thousands of plaintiffs have brought suits against a relatively small number of manufacturers and where punitive awards are sought on essentially the same basis--an alleged failure to warn.
 
 
 176
 As a further complication in the asbestos field, sheer volume, varying state laws, and concerns for future, not-yet-identified, claimants make consolidation of all the asbestos claims impossible. Legal scholars have discussed this problem and proposed legislation to permit class actions and similar procedures to remedy the problem.[14]
 
 
 177
 Some commentators suggest that the first award of punitive damages arising from a course of conduct should preempt all subsequent punitive claims. Others point to the asserted unfairness of permitting early plaintiffs to receive all of the punitive damages that can rationally be sustained, thus depriving later claimants of a similar opportunity. Still others suggest that juries in later cases should be fully informed as to all of the punitive damages that have been previously awarded. Asbestos defendants object to this proposal because such information might prejudice jurors, convincing them that punitive damages should be awarded in all cases.
 
 
 178
 Each of those proposals present problems of their own. The formidable complications unique to the mass tort field have led most courts that have been presented with due process challenges to deflect the attack by deciding each case on a subsidiary factual or procedural issue and deferring to a later date the thorny question of due process. See, e.g., Johnson v. Celotex Corp., 899 F.2d 1281, 1287-88 (2d Cir.1990) (inadequate record); Racich v. Celotex Corp., 887 F.2d 393, 397 (2d Cir.1989) (same).
 
 
 179
 Even the few opinions that have thoughtfully discussed due process objections have been deterred by governing law in their jurisdiction. For instance, in Juzwin v. Amtorg Trading Corp., 705 F.Supp. 1053 (D.N.J.), vacated, 718 F.Supp. 1233 (D.N.J.1989), the court was troubled by the serial imposition of punitive damages in asbestos cases, but ultimately decided that it would be inequitable to deny them to one plaintiff when other plaintiffs in the same and other state jurisdictions would nevertheless still have the opportunity to seek such awards.[15] That approach is understandable, but undesirable nevertheless. The rationale is faulty because it skews the scales by placing the emphasis on the wrong party.
 
 
 180
 The earlier part of this opinion weighed the rights of future claimants to compensation against the opportunity of current claimants to receive windfalls. That balancing did not rest on a concern for asbestos defendants, but rather was based on the assumption that they owed fair and reasonable compensation based on either negligence or strict liability--even to the extent of insolvency.
 
 
 181
 However, because punitive awards are windfalls and not compensation, courts should place less emphasis on plaintiffs' rights when evaluating due process arguments. Plaintiffs' entitlements are, after all, met by compensatory damages.[16] Instead, when considering the substantive due process limits on punitive awards, a court's analysis should focus on the defendants. See Malcolm E. Wheeler, The Constitutional Case for Reforming Punitive Damages Procedures, 69 Va.L.Rev. 269, 292 (1983) ("As courts have uniformly held, no plaintiff has a right to punitive damages: the purpose of punitive damages is to vindicate the public interest, not that of a particular plaintiff.").
 
 
 182
 If it were possible for a single jury to consider the extent of harm as well as the number of victims and then factor that data into a single punitive award against an asbestos manufacturer, there would be no basis for imposing punishment thereafter. See, e.g., In re "Agent Orange" Prod. Liab. Litig., 100 F.R.D. at 728 ("In theory, ... when a plaintiff recovers punitive damages against a defendant, that represents a finding by the jury that the defendant was sufficiently punished for the wrongful conduct. There must, therefore, be some limit, either as a matter of policy or as a matter of due process, to the amount of times defendants may be punished for a single transaction."). The difficulty is that in asbestos litigation, no single jury can assess a punitive damage award that includes all victims. Thus, courts must confront the unavoidable and undeniable fact that defendants are being punished over and over again for the same general course of conduct. See Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, 839-41 (2d Cir.1967).
 
 
 183
 Although Halper, 490 U.S. at 451, 109 S.Ct. at 1903, found that the "protections of the Double Jeopardy Clause are not triggered by litigation between private parties," that opinion uses language that is quite instructive in a due process analysis. As the Court observed:
 
 
 184
 "It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties. The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law.... Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment."
 
 
 185
 Id. at 447-48, 109 S.Ct. at 1901 (citations omitted). Those goals are retribution and deterrence. Id. at 448, 109 S.Ct. at 1901; see also Austin v. United States, --- U.S. ----, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (question is not whether statutory forfeiture is "civil or criminal, but rather whether it is punishment").
 
 
 186
 Because punitive damage awards serve the same purposes as criminal sanctions, Courts of Appeals concede that, at some point, multiple punitive awards in mass tort cases violate due process. See, e.g., Simpson v. Pittsburgh Corning Corp., 901 F.2d 277, 281-82 (2d Cir.1990); Johnson, 899 F.2d at 1287-88; Racich, 887 F.2d at 398 ("We agree that the multiple imposition of punitive damages for the same course of conduct may raise serious constitutional concerns, in the absence of any limiting principle."); cf. In re School Asbestos Litig., 789 F.2d at 1004-05. Those opinions, however, have not extensively explored the dimensions of this constitutional argument.
 
 
 187
 Initially, it is important to note the wrongful conduct charged to asbestos manufacturers--a failure to warn of the dangerous characteristics of the substance for years after those dangers became known to the industry. We also observe that asbestos was taken off the market in 1971. Punitive awards that are made today, therefore, punish corporate defendants over and over again for transgressions that occurred thirty to sixty years ago. Payment of those awards not only jeopardizes the ability to provide compensation for future plaintiffs, but also, by forcing companies into bankruptcy, injures employees, customers, and trade creditors who took no part in, and had no knowledge of, the wrong doing.
 
 
 188
 Moreover, unlike the situation in TXO, these cases do not involve a scenario in which the incumbent corporate officials personally participated in fraudulent and malicious activity. Punitive awards in asbestos cases usually do not punish the individuals who were responsible for the offensive conduct. See American Law Inst., supra, at 254-55. Thus, in this field, punishment is not only repetitive, but is inflicted on a vicarious basis. Basic notions of due process are offended by punishment that occurs over and over again as has happened in asbestos litigation.[17]
 
 
 189
 It may be argued that it would be unfair to disallow punitive awards at this point because current plaintiffs thus will not receive what earlier ones did. That is true. Nevertheless, such unevenness does not justify continued punishment of asbestos defendants. It would have been better had the matter of punitive damages been resolved at the beginning of the asbestos crisis, but it was not. Courts must grapple with the problem as it now exists. We are confronted with the alternative of permitting current plaintiffs to receive windfalls or stopping punishment that violates due process. The choice is obvious.
 
 
 190
 The other phase of substantive due process is proportionality. In its opinion, the Haslip majority noted that substantive due process "standards provide for a rational relationship in determining whether a particular award is greater than reasonably necessary to punish and deter." 499 U.S. at 35, 111 S.Ct. at 1052. Similarly, in her dissent, Justice O'Connor recognized that whether an award is grossly excessive is an "important substantive due process concern." Id. at 92, 111 S.Ct. at 2002 (O'Connor, J., dissenting). We may take from Haslip, therefore, that a punitive award that is greater than reasonably necessary to punish and deter violates substantive due process. See id. at 31-32, 111 S.Ct. at 1057.
 
 
 191
 Courts must also remember that punitive damages are intended to "sting," not to destroy. See In re Northern Dist. of Cal. "Dalkon Shield" IUD Prods. Liab. Litig., 526 F.Supp. 887, 899 (N.D.Cal.1981), vacated on other grounds, 693 F.2d 847 (9th Cir.1982). Indeed, in its early years the common law dictated that punitive awards should not be so large as to threaten the economic viability of defendants.
 
 
 192
 Because punitive damages are quasi-criminal, an analogy may be found in the early English practice of amercements. See John C. Jeffries, Jr., A Comment on the Constitutionality of Punitive Damages, 72 Va.L.Rev. 139, 154-58 (1986). A wrongdoer could buy "peace" through the payment of a fine or amercement to the king. Id. at 154. Chapter 20 of the Magna Carta, 9 Hen. III, ch. 14 (1225), limited the king's power to impose fines, providing that a freeman shall be amerced "saving always his position; and a merchant in the same way, saving his trade; and a villein shall be amerced in the same way, saving his tillage." James Tait, Studies in Magna Carta: Waynagium and Contenementum, in 27 Eng.Hist.Rev. 720, 727 (Reginald L. Poole ed. 1912). Thus, the penalty inflicted should not, in any event, destroy the offender's means of making a living in his particular trade or calling. Magna Carta guaranteed not just bare survival, but continued productive economic viability.[18]
 
 
 193
 Having arrived at the principle that at some point further repetitive punitive damages are neither rational nor fair, the difficult question is how to determine when that point has been reached. Some assistance may be found in the approach that courts use to determine whether a traditional punitive award is excessive. Many of the same factors considered in the usual one-on-one case are helpful.
 
 
 194
 For example, in Haslip, 499 U.S. at 30-31, 111 S.Ct. at 1057, the Court approved Alabama's judicial review that included such considerations as:
 
 
 195
 (a) a reasonable relationship between the award and harm from defendant's conduct;
 
 
 196
 (b) the reprehensibility of defendant's conduct, its duration, defendant's awareness or concealment, and the existence and frequency of past misconduct;
 
 
 197
 (c) the profitability to defendant of the conduct;
 
 
 198
 (d) the financial position of defendant;
 
 
 199
 (e) all the costs of litigation;
 
 
 200
 (f) the imposition of criminal sanctions; and
 
 
 201
 (g) the existence of other civil awards against defendant for the same conduct.
 
 
 202
 In TXO, --- U.S. at ----, 113 S.Ct. at 2719, the plurality opinion relied on a general concern of reasonableness. In general, these considerations give the courts some basis on which to decide whether punitive damages should be permitted. However, other matters unique to mass torts--other punitive awards, the effect of those awards on current and future claimants for compensation, and the adverse effect on settlement of pending claims--must also enter into the calculus. After taking all these factors into account to determine that a defendant has been adequately deterred and punished, a court must strike down all subsequent punitive awards in order to preserve due process.
 
 
 203
 As a practical matter, we note that those manufacturers that have become bankrupt may have already escaped from the burden of punitive damages.[19] To the extent, however, that liability for exemplary awards may be joint and several in some jurisdictions, the inability of one defendant to pay punitives imposes an additional burden on those still solvent.
 
 
 204
 The amount of awards returned against Owens-Corning is more than enough for punishment. Although some verdicts may have been reduced on appeal and others compromised in later settlement agreements, that diminution is no doubt more than offset by the amount other settlements have been inflated because of the threat of punitive damages.
 
 
 205
 The fact that this company concedes that it would not be driven into bankruptcy by the punitive damage award here does not moot due process objections. If bankruptcy is the test, then due process relief will always come too late. In this case, punitive awards already assessed against Owens-Corning equal a substantial portion of the company's total Kaylo sales. The sum of compensatory awards, punitive damages, and litigation expenses dwarf any profits.
 
 
 206
 Owens-Corning has been able to remain solvent by producing goods not related to its ill-fated venture into asbestos products.[20] That fact should have no bearing on whether defendant should be punished more than a company whose activities were limited to asbestos and has become bankrupt. Repetitious punishment should not depend on the wealth or poverty of the offender. Due process is the right of every citizen, corporate or individual, wealthy or impoverished. Moreover, and perhaps more importantly, although the case before us only involves one defendant, the holding will apply to other asbestos litigation within this circuit.
 
 
 207
 I am persuaded that the punitive damages award against Owens-Corning should be stricken. The amounts awarded in prior litigation have been more than adequate to meet the needs of punishment and deterrence. Thus, permitting an award to the plaintiff serves no rational purpose.
 
 
 208
 I dissent.
 
 
 209
 Judge GREENBERG, Judge HUTCHINSON, and Judge SCIRICA join in this dissent.
 
 
 210
 BECKER, Circuit Judge, dissenting.
 
 
 211
 Judge Weis has demonstrated powerfully that the repetitive imposition of punitive damages upon Owens-Corning for failure to warn in connection with the same series of acts (the sale of asbestos products) has, in terms of the legal justification for punitive damages, become so irrational as to offend the due process clause of the Fourteenth Amendment. I therefore join in Part II of his dissent. I note in this regard that the majority's slicing of the punitive damages award from $2 million to $1 million in a single sentence on the grounds that "the district court gave insufficient consideration to the effects of successive punitive awards in asbestos litigation" is a testament to the force of Judge Weis's argument.
 
 
 212
 I do not, however, join in Part I of Judge Weis's dissent. The majority has convincingly demonstrated why we should not, in the exercise of our powers as the final expositors of Virgin Islands law, declare the repetitive imposition of punitive damages unavailable as a matter of Virgin Islands common law.
 
 
 213
 I respectfully dissent.
 
 
 
 [1]
 The order granting rehearing in banc vacated the original opinion pursuant to this court's Internal Operating Procedure 9.5.9
 
 
 [2]
 In a memorandum dated December 19, 1966, it was stated that a warning label should be "show[n] on all cartons in which we deliver Kaylo products." App. at 2236
 
 
 [3]
 Specifically, Dunn's counsel stated:
 Unfortunately, ladies and gentlemen, you have heard a story here in this courtroom the last two weeks of corporate manipulation, of corporate suppression, and a word that I hate to use, of corporate lies.
 But, what's so bad about that is just not things that occur over the last 40 or 50 years. But, it's even occurred in this courtroom. It's occurred in this courtroom.
 App. at 1755.
 
 
 [4]
 Specifically, Dunn's counsel argued: "You've got to have courage to tell this big multi-national company, that it's not going to come into the Virgin Islands and hurt people and lie about it." App. at 1762
 
 
 [5]
 Comment e to the Restatement (Second) of Torts Sec. 908 (1977), which discusses punitive damages, states in relevant part: "Included in the harm to the plaintiff may be considered the fact that the plaintiff has been put to trouble and expense in the protection of his interests, as by legal proceedings in this or in other suits." Thus, arguably statement (3) was not, in itself, inappropriate
 
 
 [6]
 In Herman v. Hess Oil Virgin Islands Corp., 524 F.2d 767, 772 (3d Cir.1975), we concluded that a similar remark made in plaintiff's closing argument on punitive damages was not "so prejudicial ... as to constitute reversible error in the absence of any objection or request for a cautionary instruction." We also noted that "it is proper to assess punitive damages as a deterrent and an example to the community." Id. (emphasis added)
 
 
 [7]
 During Dunn's closing argument, counsel for OCF objected to the analogy to Michael Milken and asked for a curative instruction, which the court declined to give. See App. at 1758-59. In addition, directly following Dunn's closing arguments, counsel for OCF moved for a mistrial, specifically objecting to Dunn's argument that "we came in here and lied." App. at 1763
 
 
 [8]
 We note that references to the defendant's wealth are not, in themselves, inappropriate in a closing argument on the issue of punitive damages. See Restatement (Second) of Torts Sec. 908(2) (1977); Herman, 524 F.2d at 772 ("the wealth of the defendant is a factor which may properly be considered by the trier of fact in assessing punitive damages")
 
 
 [9]
 Neither the language of the Restatement and the accompanying comments nor prior case law supports the proposition that punitive damages must be related to actual injuries. See Restatement (Second) of Torts Sec. 908(2) (1977) ("trier of fact can properly consider ... the nature and extent of the harm to the plaintiff") (emphasis added); id. at Sec. 908(2) cmt. c (while "the extent of the harm may be considered in determining their amount, it is not essential to the recovery of punitive damages that the plaintiff should have suffered any harm, either pecuniary or physical") (emphasis added); Hospital Auth. v. Jones, 261 Ga. 613, 409 S.E.2d 501, 503 (1991) (rejecting "notion that punitive damages must necessarily bear some relationship to the actual damages awarded by the jury"), cert. denied, --- U.S. ----, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992); Kirkbride v. Lisbon Contractors, Inc., 521 Pa. 97, 555 A.2d 800, 803-04 (1989) (punitive damages need not bear reasonable relationship to compensatory damages under Restatement Sec. 908; remittitur always available to reduce awards that shock the conscience)
 
 
 [10]
 This Rule states in pertinent part:
 No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.
 Fed.R.Civ.P. 51 (emphasis added).
 
 
 [11]
 In Levinson v. Prentice-Hall, Inc., 868 F.2d 558, 564 (3d Cir.1989), on which OCF relies, we found that the defendant had preserved its objection in accordance with Rule 51
 
 
 [12]
 Under the Restatement, in determining the amount of punitive damages, the trier of fact can consider such factors as (1) the act itself, including the motives of the wrongdoer, the relations between the parties, and provocation or want of provocation; (2) the extent of harm to the injured person, including the expense to which plaintiff has been put in bringing a lawsuit; (3) the wealth of the defendant; and (4) the existence of multiple claims. Restatement (Second) of Torts Sec. 908 cmt. e (1977)
 
 
 [13]
 The Court did state that "it is always helpful for trial judges to explain the basis for their rulings as thoroughly as is consistent with the efficient despatch of their duties." TXO, --- U.S. at ----, 113 S.Ct. at 2724. We emphasize for the trial judges in this circuit the importance this court places on reasoned explanations of discretionary decisions. See United States v. Criden, 648 F.2d 814, 819 (3d Cir.1981) ("[A]rticulation of the reasons for the decision tends to provide a firm base for an appellate judgment that discretion was soundly exercised.")
 
 
 [14]
 Specifically, the district court concluded that $2 million was an appropriate amount to offer in remittitur as "th[is] sum is rationally related to the $500,000 in compensatory damages without having exceeded the multiple of four constitutionally permitted by the Supreme Court in Haslip." Dunn, 774 F.Supp. at 951 (citation omitted). In Haslip the Court found the punitive damages award in that case to be reasonable even though it exceeded the compensatory award by four times because "it d[id] not cross the line into the area of constitutional impropriety." 499 U.S. at 19, 111 S.Ct. at 1046. See also TXO, --- U.S. at ----, 113 S.Ct. at 2720 (indicating that a 10-to-1 ratio between punitive damages awarded and the potential harm of defendant's conduct would be constitutionally permissible) (plurality opinion)
 
 
 [15]
 We recommend that in the future district courts explicitly assess the amount of a punitive damages award in light of the factors set out in comment e of Restatement Sec. 908. See supra note 12
 
 
 [16]
 In Haslip, the Court listed the factors considered under Alabama law in post-trial and appellate review:
 (a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.
 499 U.S. at 17, 111 S.Ct. at 1045. In addition, the Alabama Supreme Court conducts a comparative analysis. Id.
 In satisfying itself of the reckless character of OCF's conduct, examining OCF's net worth, and considering the relationship between the size of the compensatory and punitive awards, the district court found evidence to support three of the factors listed above (i.e., factors (a), (b), and (d)). It also conducted a comparative analysis. This review was enough to support the award of punitive damages in this case. See Eichenseer, 934 F.2d at 1382-84 (evidence in record sufficient to satisfy three of seven Haslip factors, and thus "the record in this case provides sufficient support for the award of punitive damages").
 
 
 [17]
 The Reporters' Study noted that two states have taken legislative action in this area. A Georgia statute, applicable to product liability claims in Georgia courts, allows only a single punitive award (the first to be obtained) for all claims arising out of the same conduct. See Ga.Code Ann. Sec. 51-12-5.1(e) (Michie 1990). A Missouri statute, which applies to most tort claims in the state, allows the defendant in a post-trial hearing to request credit for prior punitive damages awards arising from the same conduct. See Mo.Ann.Stat. Sec. 510.263(4) (Vernon 1952 & Supp.1992)
 
 
 [18]
 In that regard, we find it telling that the Governor of the Virgin Islands recently transmitted a bill to the legislature concerning damages for personal injuries that proposed limiting punitive damages awards for economic and non-economic damages but expressly exempted "defective product claims" from its terms. See Bill No. 20-0041 to amend Tit. 5, Ch. 41, V.I.Code (introduced Feb. 1, 1993)
 
 
 [19]
 After conducting an exhaustive search of several sources, including published opinions, computer databases, law reviews and legal commentaries, court records, trial verdict reporters, and interviews with lawyers involved in products liability cases, see Demystifying Punitive Damages at 2-4. Rustad and his associates located a total of 355 products liability cases involving punitive damages awards throughout the country in the quarter century from 1965-1990. Id. at vi
 
 
 [20]
 In a study of punitive damages verdicts in 47 counties in 11 states, the authors noted that only 8.9% of successful products liability plaintiffs were also awarded punitive damages. See Myth and Reality, 75 Minn.L.Rev. at 38; see also Demystifying Punitive Damages at 24 (noting that while approximately 200,000 American women were injured by Dalkon Shield, there were only 11 punitive damages awards in the 51 cases that went to trial)
 
 
 [21]
 The court explained that this theory could only be applied where the defendant can demonstrate that the jury in the first case to reach final judgment "had a complete record of the full extent of [the defendant's] wrongful conduct in failing to warn all users of the dangers of its asbestos products, [ ] or that [the] jury was instructed to return a punitive award appropriate as punishment for the totality of such misconduct." Simpson, 901 F.2d at 281
 
 
 [22]
 The court in Simpson concluded that all asbestos cases involving a single defendant cannot "be lumped together for the purpose of testing punitive awards against the limits of due process." 901 F.2d at 281. "The wrongfulness of a defendant's conduct will normally be subject to varying assessments depending on the degree to which the dangers of its product were known at a particular time and the deliberateness of its conduct in declining to warn or even concealing dangers of which it was aware." Id
 
 
 [23]
 In an appendix to its supplemental appellate brief, OCF submitted its 1991 Annual Report, which provides a further indication of the company's ability to pay future punitive damages awards. In particular, the Report notes that "the Company's products liability insurance policies should cover virtually all of the Company's cash expenditures for indemnity and defense costs for asbestos personal injury claims through 1996 or 1997.... The cash expenditures ... for the unasserted claims covered by [an] $800 million [non-recurring, non-cash] charge to 1991 earnings are expected to be incurred over a period of approximately seven years, between 1996 and 1997 and 2003 and 2004." Appellant's Supplemental Brief, Appendix A, at 15
 The Report also noted that OCF's unexhausted product liability insurance reserves totaled $1.13 billion at the end of 1991. Id.
 
 
 [24]
 It was only in its appendix to its supplemental brief to this court that OCF made any claim concerning the profitability of its Kaylo product. See Appellant's Supplemental Brief, Appendix D, at 3-4 (estimating total sales at $142.7 million with total profit ranging from $1.4 million to $7.7 million). We are unwilling to act on the basis of such evidence, which was not before the district court and which was not subject to challenge by appellee
 
 
 [1]
 1 V.I.C. Sec. 4, Revision Note
 
 
 [2]
 1 V.I.C. Sec. 4
 
 
 [3]
 See also Haize v. Hanover Insurance Co., 536 F.2d 576, 578 n. 1 (3d Cir.1976) ("It could be argued that the 1942 Restatement of Judgments no longer expresses the rules of the common law to the extent it requires mutuality, and that therefore the common law 'as generally understood and applied in the United States' governs.")
 
 
 [4]
 Two examples illustrate my point. The first is the court's statement that "[e]ven if there were some level of award that would itself evidence prejudice and passion" and thus warrant a new trial, "we cannot hold that the $25 million award here, albeit large, necessarily indicates a verdict tainted by prejudice and passion." Maj.Op. at 1383. The court goes on to hold, however, that this award was not only "large" but 25 times too large. Thus, the court in effect holds that even if an award could be so big that it would show passion or prejudice, an award that is merely 25 times too big is not big enough. I must say that I do not find this reasoning compelling
 The second example is the court's statement that "a typical ratio for a punitive damages award to a defendant's net worth may be around one percent." Maj.Op. at 1383. This pronouncement is based on a footnote in Cash v. Beltmann North American Co., 900 F.2d 109, 111 n. 3 (7th Cir.1990), which in turn cited as support for this proposition six reported cases in which the average ratio was 0.49% and the median was 0.21%. The footnote also includes a "but see" citation to two additional cases in which the ratios were 40% and 23.33%. To my mind, this extremely small and disparate sample does not show what the typical ratio is in fact. More important, this sample clearly does not show what ratio is needed to serve the purposes of punitive damages--to deter and punish.
 
 
 [1]
 For a representative--but by no means complete--sample of articles, see Dennis N. Jones, et al., S. Brett Sutton & Barbara D. Greenwald, Multiple Punitive Damages Awards for a Single Course of Wrongful Conduct: The Need for a National Policy to Protect Due Process, 43 Ala.L.Rev. 1 (1991); Richard A. Seltzer, Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control, 52 Fordham L.Rev. 37 (1983); Special Project, An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation, 36 Vand.L.Rev. 573 (1983); Symposium, Punitive Damages, 40 Ala.L.Rev. 687 (1989); Symposium, Punitive Damages, 56 S.Cal.L.Rev. 1 (1982)
 
 
 [2]
 Professor Prosser, a Reporter for the Restatement (Second) of Torts, conceded that punitive damages in mass torts present a "problem which has arisen to haunt the courts." Noting the issue of multiple awards, he wrote: "The question might well lead to a re-examination of the whole basis and policy of awarding punitive damages." William L. Prosser, The Law of Torts Sec. 2, at 13 (4th ed. 1971). Indeed, a recent report to the American Law Institute suggests major alterations in the law of punitive damages. 2 American Law Inst., Reporters' Study on Enterprise Responsibility for Personal Injury: Approaches to Legal and Institutional Change 256-64 (1991)
 
 
 [3]
 See E. Jeffrey Grube, Punitive Damages: A Misplaced Remedy, 66 S.Cal.L.Rev. 839, 850-55 (1993)
 
 
 [4]
 The constitutionality of such provisions has been challenged in three of those states. In Gordon v. State, 585 So.2d 1033, 1035-36 (Fla.App.1991), aff'd, 608 So.2d 800 (Fla.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1647, 123 L.Ed.2d 268 (1993), the Court found the Florida provision constitutional because a claimant does not have a cognizable right to the recovery of punitive damages. However, in McBride v. General Motors Corp., 737 F.Supp. 1563 (M.D.Ga.1990), and Kirk v. Denver Pub. Co., 818 P.2d 262 (Colo.1991), the courts found statutes unconstitutional. McBride held that the Georgia statute violated the Equal Protection Clause because it only applied to product liability claimants and allowed non-product liability claimants to recover 100% of their awards. 737 F.Supp. at 1569-70. Kirk ruled that a punitive damages judgment is a private property right and that the Colorado statute is an unconstitutional taking of property. 818 P.2d at 272
 
 
 [5]
 Lester Brickman, The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?, 13 Cardozo L.Rev. 1819, 1863-66 (1992)
 
 
 [6]
 "[W]e do not believe that defendants should be relieved of liability for punitive damages merely because, through outrageous misconduct, they may have managed to seriously injure a large number of persons. Such a rule would encourage wrongdoers to continue their misconduct because, if they kept it up long enough to injure a large number of people, they could escape all liability for punitive damages." Froud v. Celotex Corp., 107 Ill.App.3d 654, 63 Ill.Dec. 261, 264, 437 N.E.2d 910, 913 (Ill.App.1982), rev'd on other grounds, 98 Ill.2d 324, 74 Ill.Dec. 629, 456 N.E.2d 131 (Ill.1983)
 
 
 [7]
 As one commentator explained, punitive damages seek "to deter a specific course of conduct by decreeing that a manufacturer already condemned to 'death' via bankruptcy for engaging in a course of conduct resulting in enormous compensatory liability, would again be condemned to extinction if the act were particularly heinous. 'Dying' a second time is certainly inconvenient and while the prospect may accelerate the rate of the 'first' death, that hardly constitutes deterrence." Lester Brickman, supra, at 1864
 
 
 [8]
 The compilation of judgments that defendant provided to the court in this case lists a single punitive award for $150 million and other awards from 1989 and 1990 totaling approximately $113 million
 
 
 [9]
 In his dissertation prepared for the LLM program for Judges at the University of Virginia Law School, Judge Surrick concludes that punitive damages have no place in asbestos litigation. He says that balancing social and economic consequences mandates that conclusion. He also refers to "judge-made doctrines" of punitive damages in asbestos litigation and says that appellate courts should rise above parochial considerations. "When the reasons for a rule no longer exist, the rule should be abolished." Honorable R. Barclay Surrick, Punitive Damages and Asbestos Litigation in Pennsylvania: Punishment or Annihilation?, 87 Dick.L.Rev. 265, 301 (1983)
 
 
 [10]
 As Judge Weinstein has concluded: "overhanging th[e] massive failure of the present system is the reality that there is not enough money available from traditional defendants to pay for current and future claims. Even the most conservative estimates of future claims, if realistically estimated on the books of many present defendants, would lead to a declaration of insolvency...." In re Joint E. & S. Dist. Asbestos Litig., 129 B.R. at 751; see also Jack B. Weinstein & Eileen B. Hershenov, The Effect of Equity on Mass Tort Law, 1991 U.Ill.L.Rev. 269, 290 ("Our view is that from the beginning mass torts should be treated similarly to a bankruptcy proceeding. No matter how financially healthy the defendants in these huge cases, the sheer number of present and future victims means that we are ultimately dealing with a limited compensation fund.")
 
 
 [11]
 The high transaction costs of asbestos cases that diminish the pool of available assets have been authoritatively documented. They are also a very serious problem, but one that cannot be addressed here
 
 
 [12]
 Professor Owen, whose endorsement of punitive damages in products liability cases has been widely cited, see David G. Owen, Punitive Damages in Products Liability Litigation, 74 Mich.L.Rev. 1257, 1325 (1976), stated: "[O]nce the bankruptcy of the defendant manufacturer appears to be a real and imminent possibility, punitive damages should no longer be available at all." It is interesting that in a later law review article, Professor Owen substantially modified his endorsement of punitive damages and cautioned against excessive awards. See David G. Owen, Problems in Assessing Punitive Damages Against Manufacturers of Defective Products, 49 U.Chi.L.Rev. 1 (1982)
 
 
 [13]
 It is worth noting that two trial courts have recognized that punitive awards present a danger that available funds will be inadequate to pay compensatory damages
 Judge Marshal A. Levin of the Maryland Circuit Court of Baltimore City ordered that payment of punitive awards for approximately 8,500 plaintiffs in a consolidated proceeding be deferred until compensatory damages have been satisfied. Abate v. A.C. & S., Inc., No. 89236704, slip op. at 26 (Md.Cir.Ct. Baltimore City Dec. 9, 1992).
 In a somewhat similar action, Judge Charles Weiner of the United States District Court for the Eastern District of Pennsylvania (to whom the multi-district panel has assigned some 30,000 federal asbestos cases) severs punitive damages claims from the compensatory ones. In ordering cases back to transferor courts for trial, Judge Weiner provides that "the issue of punitive damages must be resolved at a further date." E.g., In re Asbestos Prods. Liab. Litig. (No. VI), No. MDL 875, slip op. at 2 (E.D.Pa. June 8, 1993) (order relating to No. 92-6377 from the Southern District of New York).
 In reality, it is quite likely that in many instances the delay will result in payment of no punitive damages, or at a time so far in the future that many of the plaintiffs will no longer be alive.
 
 
 [14]
 Dennis N. Jones, S. Brett Sutton & Barbara D. Greenwald, supra, at 23-32; David G. Owen, supra, 74 Mich.L.Rev. at 1325; Richard A. Seltzer, supra, at 83-91; Comment, Mass Liability and Punitive Damages Overkill, 30 Hastings L.J. 1797, 1800-08 (1979)
 
 
 [15]
 See also Jim Fieweger, Note, The Need for Reform of Punitive Damages in Mass Tort Litigation: Juzwin v. Amtorg Trading Corp., 39 DePaul L.Rev. 775 (1990); N. Todd Leishman, Note, Juzwin v. Amtorg Trading Corp.: Toward Due Process Limitations on Multiple Awards of Punitive Damages in Mass Tort Litigation, 1990 Utah L.Rev. 439
 
 
 [16]
 Arguments can be made for distributing punitive awards among all who suffered from the defendants' conduct--but that proposition is irrelevant in determining that, at some point, due process demands an end to punishment
 
 
 [17]
 See William W. Schwarzer, Punishment Ad Absurdum, 11 Cal.Law. 116 (1991) ("Surely allowing successive awards of punitive damages for the same conduct is offensive to the most basic notions of due process and to the spirit underlying the constitutional bar against double jeopardy. More important, it is poor public policy.")
 
 
 [18]
 John C. Jeffries, Jr., supra, at 154-58. The Amercements Clause of Magna Carta is discussed in detail in Browning-Ferris, 492 U.S. at 268-73, 109 S.Ct. at 2916-19. The majority recognized that the Amercements Clause limited abuses "by requiring that the amercement not be so large as to deprive him of his livelihood," but concluded that such history did not justify the application of the Eighth Amendment to punitive awards in private suits. Id
 
 
 [19]
 A punitive award is dischargeable in bankruptcy unless a plaintiff can show that the bankrupt maliciously or willfully caused the plaintiff's injury. 11 U.S.C. Sec. 523(6). In strict liability cases, this standard is generally not met. 1 James D. Ghiardi & John J. Kircher, Punitive Damages: Law and Practice Sec. 9.19 (1983). Moreover, even if met, bankruptcy courts may exercise their equitable powers to deny such damages. See In re A.H. Robins Co., 89 B.R. 555 (E.D.Va.1988) (disallowing punitive damages because they would frustrate a successful reorganization of the company in this Dalkon Shield case)
 
 
 [20]
 The ALI Reporters Study calling for punitive damages reform notes that corporate wealth is typically spread among various corporate subsidiaries. Thus, it often is only an accident of the corporate structure that places this wealth in the hands of the particular defendant entity. American Law Inst., supra, at 254; see Victor E. Schwartz & Mark A. Behrens, The American Law Institute Reporters' Study on Enterprise Responsibility for Personal Injury: A Timely Call for Punitive Damages Reform, 30 San Diego L.Rev. (Fall 1993)